**Supreme Court**

No. 2010-77-Appeal.
(WC 05-264)

George E. Morabit                    :

v.                                   :

Dennis Hoag.                         :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

George E. Morabit :

v. :

Dennis Hoag. :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Indeglia, for the Court.** In this dispute between neighbors, George E. Morabit (plaintiff or Morabit) appeals from several adverse rulings rendered by a Washington County Superior Court trial justice. On appeal, he argues that the trial justice committed reversible error in: (1) denying his request to depose a proposed lay witness; (2) refusing to certify one of his witnesses as an expert in the study of historic stone walls; (3) denying his motion to amend his complaint; (4) granting the defendant's motion for judgment as a matter of law; and (5) denying his motion for a new trial. After reviewing the record and considering the parties' written submissions and oral arguments, we vacate the judgment of the Superior Court.

## I

## Facts and Travel

In 1986, Dennis Hoag (defendant or Hoag) acquired land located at 385 Snuff Mill Road in North Kingstown, Rhode Island. In 1991, Morabit purchased approximately fifty-three acres of property, abutting immediately to the north of defendant's property. Morabit's property is

mostly undeveloped woodland.[1]  A stone wall demarcates the boundary between the northern edge of Hoag's land and the southern edge of plaintiff's property.

While walking his property sometime in the early 2000s, Morabit discovered that a large portion of the stone wall had been destroyed.  Just north of the stone wall, a significant number of trees were missing.  After receiving no response to several letters that his counsel sent to Hoag, Morabit filed a complaint in Washington County Superior Court on April 27, 2005.  In his complaint, Morabit sought to recover damages from Hoag under G.L. 1956 § 34-20-1 (count 2).  That statute renders any person who engages in the unauthorized cutting, destroying, or carrying away of any trees, timber, or wood liable to the property owner for twice the value of the trees cut or destroyed and three times the value of the wood.[2]

Morabit also alleged that he was entitled to damages for Hoag's destruction or removal of the stone wall under G.L. 1956 § 9-1-2 and G.L. 1956 § 11-41-32 (count 3).[3]  Section 11-41-32 states that any person convicted of the theft of an historic stone wall, or a portion of an historic

---

[1] Of the fifty-three acres, plaintiff retains development rights for approximately seventeen acres, having donated the development rights for the remaining acreage to the Town of North Kingstown.

[2] General Laws 1956 § 34-20-1provides:

> "Every person who shall cut, destroy, or carry away any tree, timber, wood or underwood whatsoever, lying or growing on the land of any other person, without leave of the owner thereof, shall, for every such trespass, pay the party injured twice the value of any tree so cut, destroyed, or carried away; and for the wood or underwood, thrice the value thereof; to be recovered by civil action."

[3] In his complaint, Morabit also alleged that Hoag had unlawfully interfered with an easement that Morabit possesses over Hoag's land (count 1).  Morabit requested injunctive and declaratory relief to prevent any further alteration of his property and any further interference with the easement (counts 4 and 5).  The existence of the easement was not disputed during the proceedings below and the parties agreed to preserve all rights, responsibilities, and privileges relating to the easement.  The easement is not at issue in the instant appeal.

stone wall, shall be guilty of larceny. Subsection (d) of § 11-41-32 provides that anyone convicted of stealing an historic stone wall shall be civilly liable to the property owner for the cost of replacing the stones and any other compensable damages.[4] Section 9-1-2 provides civil liability for criminal offenses. Under that provision, a plaintiff may recover civil damages for injury to his or her estate that results from the commission of a crime or offense, irrespective of whether charges have been filed against the offender.

On January 23, 2009, three days before a trial on plaintiff's claims was scheduled to commence, plaintiff moved for a continuance. Counsel for plaintiff indicated that she had been unable to make contact with Bruce Walker, a former neighbor of Hoag's who was expected to testify as a percipient witness on Morabit's behalf. When trial commenced on the morning of January 27, 2009, counsel for plaintiff informed the court that she had learned on the previous afternoon that Mr. Walker was confined to a nursing home with an infection. Counsel requested permission to depose Mr. Walker at the nursing home, emphasizing that Mr. Walker was the only witness who could testify directly to Hoag's activities during the relevant time period.

---

[4] General Laws 1956 § 11-41-32 is known as the "Leona Kelley Act," in honor of the late South Kingstown state representative, Leona Kelley. That section provides, in relevant part:

> "(b) * * * any person convicted of the theft of an historic stone wall, or portions of a wall, shall be subject to the penalties for larceny * * *.

> "(c) For the purposes of this chapter, 'historic stone wall' is defined as a vertical structure of aligned natural stone, originally constructed in the 17th, 18th, 19th or 20th centuries, to designate a property boundary between farmsteads or to segregate agricultural activities with a single farmstead or to designate property lines.

> "(d) Anyone convicted of the larceny of an historic stone wall, or portions of a wall, or convicted of attempt to commit larceny, shall be civilly liable to the property owner for the cost of replacing the stones and any other compensable damages related to the larceny."

The trial justice denied plaintiff's motion to depose Mr. Walker at the nursing home. She reasoned that plaintiff had ample opportunity before trial to take Mr. Walker's deposition. The trial justice further noted that, given Mr. Walker's advanced age of eighty-four years, plaintiff should have anticipated the need to preserve Mr. Walker's testimony.

After the trial justice denied plaintiff's discovery request, the case opened to a jury. Over the course of a six-day trial, the jury heard from multiple witnesses, reviewed several exhibits, and took a view of the property. We summarize below the evidence most relevant to the instant appeal.

Morabit testified on his own behalf. He stated that, when he purchased his property in 1991, work was under way on Hoag's parcel. In particular, Morabit testified that he had observed "constant clearing[] of trees" from Hoag's land and "dump truck load upon dump truck load of fill coming into [Hoag's] property." Morabit indicated that, in addition to the dump trucks, other heavy equipment, including excavators, bulldozers, and backhoes, had been present on defendant's property at one time or another during construction. He estimated that the work on defendant's property had lasted for a period of ten years or more. Morabit further indicated that he and Hoag have had a less than congenial relationship since becoming neighbors in 1991.

Morabit described the scope of the damage that he observed on the southern part of his property. He estimated that the semicircular area of missing trees was roughly 400 feet long with a radius of sixty to eighty feet. Morabit believed that the missing trees were predominantly of the tupelo variety, which he asserted is a rare and historic species. The stone wall, he noted, "was destroyed and what was left in its place were various boulders that did not come from [his] property." Morabit testified that stones from the wall appeared to have been pushed from the

direction of Hoag's property towards his property. According to his estimate, the damaged portion of the wall extended 300 to 400 feet.

The plaintiff presented witness Robert Thorson, a professor of geology at the University of Connecticut with an expertise in human impacts on the landscape. Professor Thorson specified that he focuses on the study of historic stone walls. He stated that he has published three books and numerous articles relating to stone walls. Professor Thorson also indicated that he has testified in court on the subject of stone walls on at least one prior occasion.

After defendant objected to recognizing Professor Thorson as an expert, the trial justice conducted a voir dire hearing, outside the presence of the jury, on the admissibility of his testimony. The trial justice ultimately recognized Professor Thorson as an expert in the field of geology but precluded any testimony based on stone wall science. She reasoned that the study of historic stone walls was unreliable because it had not garnered sufficient acceptance in the scientific community or been subjected to adequate peer review. The trial justice clarified, however, that Professor Thorson could offer opinions concerning stone walls to the extent those opinions were based upon his knowledge of geology.

Thereafter, Professor Thorson testified that he had twice visited Morabit's property and prepared a report based on his study of the property. He characterized the segment of stone wall marking the north-south boundary of the parties' properties as an "old historic wall" and "an established * * * boundary line wall[.]" It was Professor Thorson's opinion to a reasonable degree of scientific certainty that the stone wall was deliberately destroyed by a backhoe, bulldozer, or other piece of heavy equipment pushing the stones in the direction of Morabit's property. Professor Thorson had formed this opinion based on his observations of the arrangement, characteristics, and concentration of the stones scattered in the area immediately

surrounding the damaged portion of the wall. He estimated that the altered portion of the wall stretched for a length of approximately 120 feet. He did not offer an estimate of the cost to repair or replace the damaged wall.

The plaintiff also called Matthew Largess, an expert in arboriculture science.[5] Mr. Largess stated that he has been a professional arborist in Rhode Island for twenty-two years and has worked in the forestry business for thirty-five years. Mr. Largess testified that he first visited plaintiff's property in August 2005. He explained that during his first visit he had observed an area of clear-cutting just north and west of the stone wall, encompassing an area of approximately 135 feet by one hundred feet. In November 2008, Mr. Largess returned to the property to take samples of the young trees that had begun to grow back in the cleared area. Based on the age of the sampled trees, Mr. Largess estimated that the clear-cutting had occurred six to seven years earlier, placing the time of removal sometime around 2001 to 2002. Mr. Largess further testified that he visited plaintiff's property again on January 15, 2009.

Mr. Largess offered an opinion as to the numbers, species, and ages of the missing trees. Although there were no stumps remaining when he visited the property, Mr. Largess explained that he could estimate the number of trees removed based on his observations of the surrounding tree groves. Using his study of the adjacent forest, Mr. Largess estimated that 190 trees were removed. He additionally estimated that the relative composition of the missing trees was 70 percent tupelos, 20 percent red maples, 5 percent poplars, and 5 percent black oaks. Mr. Largess explained that tupelo trees share a "mat" of roots and tend to grow in densely packed groves, such that a large number of tupelos often grow in a relatively small area. Based on core samples

---

[5] "Arboriculture" is defined as "[t]he planting and care of woody plants, especially trees." American Heritage Dictionary of the English Language 91 (5th ed. 2011).

taken from the surrounding forest, it was Mr. Largess's opinion to a reasonable degree of scientific certainty that the missing trees were between eighty and one hundred years old.

Mr. Largess explained that he had prepared an estimate of the value of the missing trees by applying the Purdue University Method of tree appraisal (Purdue method).[6] He explained that the first step in applying the formula is to determine the "base value" of the tree being appraised. Literature from the Purdue University Department of Horticulture, admitted into evidence at trial, describes the base value as "the dollar amount assigned to one cross-section unit (square inch or square centimeter) of a tree's trunk cross-section area." Mr. Largess testified that the base value is typically calculated by obtaining a quote from one or more nurseries for the cost of a replacement tree.

Mr. Largess explained that the base value is then adjusted according to four characteristics of the tree being appraised: (1) size; (2) species class; (3) condition class; and (4) location class. The latter three factors are expressed as a percentage from one to one hundred. The percentage value for species class is assessed according to the tree's form, color, growth habit, strength, and longevity. The value for condition class reflects the tree's health, vigor, and life expectancy. Location class takes into consideration the functional and aesthetic contribution of the tree to the site. A "real good tree," Mr. Largess explained, would receive a value of 100 percent for each factor, while a "junk tree" would be assessed a value of 1 percent. A final estimate of the cost of the tree is obtained by multiplying the base value by the values for size, species class, condition class, and location class.

---

[6] According to Mr. Largess, the Purdue method is widely used by both insurance companies and government agencies to appraise trees. He further asserted that the Purdue method has undergone peer review and is accepted among arborists as a reliable method for valuing trees.

Mr. Largess then described how he applied the Purdue method to assess the value of the trees removed from Morabit's property. Mr. Largess explained that tupelo trees are rare and often hard to acquire from a nursery. He further stated that nurseries do not sell tupelo trees of a size equal to that of the eighty to one-hundred-year-old trees removed from Morabit's property. Accordingly, Mr. Largess performed his calculations based on the cost of the largest tupelo tree available at a nursery.[7] He assigned a value of 100 percent for species, condition, and location class. The 100 percent score was warranted, according to Mr. Largess, because of tupelos' longevity, resistance to pests and disease, colorful fall foliage, and location in a large and beautiful wetland area. Through application of the formula, he assessed the value of each missing tupelo tree at approximately $3,000. Based on his estimate that 70 percent of the trees removed from the property were tupelos, Mr. Largess calculated a total loss of $399,000 for the missing tupelo trees (.7 x 190 x $3000). He admitted that tupelos have no value as lumber or firewood but clarified that the Purdue method was intended to capture a tree's ecological and aesthetic value, rather than its commercial value.

Mr. Largess performed the same computations for the three remaining species of trees. He assigned the red maples a value of 80 percent for each of species class, condition class, and location class. For the missing black oak trees, he determined the values for species class, condition class, and location class to be 80 percent, 80 percent, and 90 percent, respectively. Mr. Largess gave the missing poplars a species class value of 40 percent, a condition class value of 80 percent, and a location class value of 80 percent. He valued the missing red maples, poplars,

---

[7] The article from the Purdue University Department of Horticulture explains that the Purdue method "is in widespread use for large, individual trees, which exceed the size that is usually transplanted. It is a hybrid of the replacement cost method and a process of extending that cost to larger plants."

and black oaks at $29,171, $2,430, and $8,207, respectively. Mr. Largess assessed the total value of the 190 missing trees at $439,600.

The plaintiff's final expert was Linda Steere, a wetlands and wildlife biologist who specializes in interpreting aerial photographs. Ms. Steere showed the jury a series of aerial photographs taken of the north-south boundary of the parties' properties in the years 1995, 1999, 2003, and 2008. To a reasonable degree of scientific certainty, it was Ms. Steere's opinion that the clearing of the trees and alteration of the stone wall occurred sometime between 1999 and 2003. She further opined that work was being performed on Hoag's property during those years. According to Ms. Steere, the only access for heavy equipment onto the southern portion of Morabit's property would have been through Hoag's property.

At the close of plaintiff's evidence, defendant moved for a judgment as a matter of law.[8] In support of his motion, defendant argued that (1) plaintiff had failed to introduce any direct evidence that Hoag removed trees from plaintiff's property; and (2) Mr. Largess's evidence of damages was based on mere speculation and was therefore insufficient to go to the jury. After both parties had presented arguments concerning the trees, the trial justice prompted, "Is anybody going to say anything about the wall?" In response, defendant asserted that there was no evidence of an appropriate measure of damages for the stone wall. The plaintiff explained that Professor Thorson had been expected to give an estimate of the cost of restoring the wall but

---

[8] The defendant's counsel referred to the motion as one for a "directed verdict." As this Court has previously explained, "[t]he standard for granting a motion for judgment as a matter of law is the same as that applicable to its precursor, a motion for a directed verdict." Adams v. Uno Restaurants, Inc., 794 A.2d 489, 491 (R.I. 2002) (quoting Martinelli v. Hopkins, 787 A.2d 1158, 1165 (R.I. 2001)).

was precluded from doing so.[9] The plaintiff suggested that the trial justice should nonetheless submit the issue of liability to the jury. If the jury found in plaintiff's favor on liability, the trial justice could grant equitable relief in lieu of damages. The trial justice pointed out, however, that plaintiff had failed to prove a criminal conviction for theft of the stone wall, as required to recover under § 11-41-32(d). The plaintiff then suggested that he be allowed under Rule 15(b) of the Superior Court Rules of Civil Procedure to amend his pleadings to conform to the evidence.

The trial justice denied plaintiff's request to amend. She reasoned that, even if she allowed the amendment, there was no measure of damages for the stone wall and equitable relief was inappropriate since the damage to the wall was not irreparable or incapable of quantification. She therefore granted defendant's motion for a judgment as a matter of law with respect to plaintiff's claim for the stone wall (count 3). The trial justice reserved ruling on defendant's motion with respect to the removal of the trees (count 2) but emphasized that she was troubled by plaintiff's measure of damages.

Trial continued with the presentation of defendant's evidence. Hoag testified on his own behalf. He explained that he began clearing his property in 1988 or 1989.[10] According to Hoag, he brought in loads of fill in an effort to increase the elevation of his lot by several feet. He testified that he began constructing a residence on the lot sometime around 2000. Hoag admitted

---

[9] The plaintiff avers that, during a colloquy that took place in chambers, the trial justice denied his express request that Professor Thorson be allowed to testify as to damages. On the record, counsel for plaintiff explained, "we originally intended to have [Professor] Thorson * * * testify to a restoration value on the wall and give a dollar amount of damages. That did not happen. We did have an estimate prepared, but, unfortunately, that person who prepared it was not able to testify to it."

[10] Hoag admitted that in 1990, he entered a consent agreement with the Rhode Island Department of Environmental Management (DEM), wherein he agreed to remove some of the fill he added to his property and re-plant trees in exchange for the DEM's releasing him of liability for several alleged violations.

that he hired professionals to remove tree stumps from his land using a backhoe but denied removing any trees from Morabit's property. He avowed that he had no reason to remove trees from Morabit's land, emphasizing that such a task could only have been accomplished through great expense and effort. Hoag also admitted that he ordered a backhoe operator to place large boulders on top of the stone wall in an effort to prevent Morabit's cows from entering upon his land. He expressly denied removing any stones from the wall. Prior to his house's completion in 2005, Hoag did not live on the property and only visited the site on weekends to oversee construction. The defendant did not present any evidence to rebut or contradict plaintiff's evidence on the value of the missing trees.

At the close of all evidence, defendant renewed his motion for a judgment as a matter of law. The defendant essentially reiterated the arguments he had made in support of his earlier motion. The trial justice once again informed counsel that she was concerned that the Purdue method was not an appropriate method for valuing trees. She suggested that Mr. Largess's estimate of $439,600 would exceed the fair market value of the undeveloped land and thus, result in a windfall to plaintiff. According to the trial justice, the appropriate measure of damages was the difference in the fair market value of the land before and after the trees' removal.

Despite her concerns about Mr. Largess's methodology, the trial justice ultimately concluded that the fatal flaw in plaintiff's case was his failure to introduce evidence of the trees' value at the time of removal. Relying on Tortolano v. DiFilippo, 115 R.I. 496, 349 A.2d 48 (1975), she declared that damages should have been assessed as of the date of injury. In concluding that Mr. Largess's estimate was not calculated as of the date of injury, the trial justice noted that Mr. Largess had placed telephone calls to various nurseries in order to come up with a base value for each species of tree. Based on Mr. Largess's testimony, the trial justice assumed

that Mr. Largess made those calls sometime between 2005 and 2009. She instructed that "[t]he proper inquiry would have been what was the replacement cost of a tupelo, a red maple, a poplar or a black oak in 2001, which is when the loss occurred." The failure of Mr. Largess to make such an inquiry, the trial justice reasoned, deprived his opinion of all probative value. Accordingly, she granted defendant's motion for a judgment as a matter of law with respect to plaintiff's claim for the trees (count 2). An order entered on February 23, 2009 granting judgments as a matter of law in defendant's favor on counts 2 and 3.[11]

On March 4, 2009, plaintiff filed a motion for a new trial pursuant to Rule 59 of the Superior Court Rules of Civil Procedure. The plaintiff argued that he was entitled to a new trial based on several errors that the trial justice had committed during the course of the proceedings, including her grants of judgments as a matter of law. The trial justice heard arguments on plaintiff's motion on April 3, 2009. In support of his argument that judgment as a matter of law was improperly granted, plaintiff asserted that an action for trespass[12] does not require a showing of damages. He further argued that, since Mr. Largess did not indicate whether the replacement values for the trees were based on data from 2001, it was improper for the trial justice to assume that the estimate of damages was based on data from 2005 to 2009.

In a succinct bench ruling rendered on May 8, 2009, the trial justice stated that she was "still satisfied that if the tree replacement cost was not the cost at the time of the loss, then the

---

[11] In her order, the trial justice stated that her decision to grant judgments as a matter of law in defendant's favor on counts 2 and 3 rendered counts 4 and 5 moot.

[12] Count 3 of plaintiff's complaint, relating to the destruction of the stone wall, did not specifically mention a theory of trespass. In arguing in support of his motion for a new trial, plaintiff averred that he had previously "asked the Court for permission to amend the complaint pursuant to Rule 15(b) [of the Superior Court Rules of Civil Procedure] to remove the plaintiff's reliance on [§ 11-41-32] and reinstate the claim on a theory of trespass * * * ." It is not apparent from the record, however, that the amendment which plaintiff initially proposed was an addition of a claim for trespass.

plaintiff failed to meet his burden to show an appropriate measure of damages." She similarly rejected plaintiff's argument that he should have been allowed to add a claim for trespass, reasoning that proof of damages was an essential element of plaintiff's case. Thus, the trial justice concluded that judgments as a matter of law were proper in light of plaintiff's failure to introduce any evidence of damages. Accordingly, the trial justice denied plaintiff's motion for a new trial. An order to that effect entered on May 18, 2009. Morabit timely filed a notice of appeal.

Additional facts will be provided, as necessary, to discuss the issues raised on appeal.

## II

## Issues on Appeal

Morabit raises several issues on appeal. He primarily contends that the trial justice erred in granting judgments as a matter of law in defendant's favor and precluding his expert's testimony on the subject of stone walls. Morabit additionally asserts that it was reversible error on the part of the trial justice to deny his request to depose Mr. Walker, his motion to amend his complaint to conform to the evidence, and his motion for a new trial.

## III

## Standards of Review

This Court's "review of a trial justice's decision on a motion for judgment as a matter of law is de novo." Tarzia v. State, 44 A.3d 1245, 1251 (R.I. 2012) (quoting Gianquitti v. Atwood Medical Associates, Ltd., 973 A.2d 580, 590 (R.I. 2009)). Thus, we "review[] the entry of judgment as a matter of law by applying the same standard as the trial justice, 'consider[ing] the evidence in the light most favorable to the nonmoving party, without weighing the evidence or evaluating the credibility of witnesses, and draw[ing] from the record all reasonable inferences

that support the position of the nonmoving party.'" Id. at 1252 (quoting Gianquitti, 973 A.2d at 590). Pursuant to Rule 50(a)(1) of the Superior Court Rules of Civil Procedure, a grant of a judgment as a matter of law is appropriate if "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue * * * ." If, however, there are factual issues on which reasonable people may draw different conclusions, the trial justice must deny the motion. Tarzia, 44 A.3d at 1252. "We will overturn a trial justice's decision to grant a motion for judgment as a matter of law if we determine that the trial justice has invaded the province of the jury by weighing the evidence and assessing the credibility of witnesses." Franco v. Latina, 916 A.2d 1251, 1259 (R.I. 2007) (citing Calise v. Curtin, 900 A.2d 1164, 1168 (R.I. 2006)).

In addition, "[i]t is well settled that '[t]he determination of whether to qualify and permit an expert witness to proffer an expert opinion relative to an issue in dispute is left to the discretion of the trial justice * * *.'" Foley v. St. Joseph Health Services of Rhode Island, 899 A.2d 1271, 1280 (R.I. 2006) (quoting Debar v. Women and Infants Hospital, 762 A.2d 1182, 1185 (R.I. 2000)). When the trial justice has "soundly and judicially exercised [his or her discretion], in light of the facts and circumstances confronting the court and the parties," this Court will not reverse the trial justice's decision on appeal. Dawkins v. Siwicki, 22 A.3d 1142, 1154 (R.I. 2011) (citing Morra v. Harrop, 791 A.2d 472, 476-77 (R.I. 2002)).

## IV

## Discussion

### A

### Exclusion of Expert Testimony on Stone Walls

On appeal, plaintiff argues that the trial justice abused her discretion in precluding Professor Thorson from testifying based on his expertise in the field of stone wall science. According to plaintiff, Professor Thorson possessed sufficient knowledge, skill, experience, and education to give an opinion on the fate of the stone wall and on damages. The plaintiff further suggests that the trial justice's ruling was prejudicial because her later decision to grant a judgment as a matter of law was based on plaintiff's failure to introduce any evidence of damages.

"The purpose of expert testimony is to aid in the search for the truth." Morra, 791 A.2d at 477. Under Rule 702 of the Rhode Island Rules of Evidence, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of * * * opinion."

Because novel scientific or complex technical evidence is often difficult for the factfinder to evaluate, such evidence "runs the risk of being 'both powerful and quite misleading.'" Owens v. Silvia, 838 A.2d 881, 891 (R.I. 2003) (quoting DiPetrillo v. Dow Chemical Co., 729 A.2d 677, 688 (R.I. 1999)). Thus, when a party seeks to introduce novel or complex evidence, the trial justice will exercise a gatekeeping function. Blue Coast, Inc. v. Suarez Corp. Industries, 870 A.2d 997, 1006 (R.I. 2005). In performing that gatekeeping role, the trial justice holds "a preliminary evidentiary hearing outside the presence of the jury in order to determine whether

such evidence is reliable and whether the situation is one on which expert testimony is appropriate." DiPetrillo, 729 A.2d at 685 (quoting State v. Quattrocchi, 681 A.2d 879, 884 (R.I. 1996)). The trial justice's primary function as gatekeeper is to make certain "that the proposed expert testimony, presented as a scientifically valid theory, is not mere 'junk science.'" Owens, 838 A.2d at 891 (citing Gallucci v. Humbyrd, 709 A.2d 1059, 1064 (R.I. 1998)). The trial justice thereby ensures that the trier of fact considers "only expert testimony that is based on ostensibly reliable scientific reasoning and methodology." Id. (citing DiPetrillo, 729 A.2d at 690).

We instructed in DiPetrillo that the trial justice should look to four nonexclusive factors to assist him or her in assessing the reliability and validity of expert testimony that involves novel or technically complex theories or procedures. DiPetrillo, 729 A.2d at 689. Those factors are: (1) whether the proffered knowledge has been or can be tested; (2) whether the theory or technique has been the subject of peer review and publication; (3) whether there is a known or potential rate of error; and (4) whether the theory or technique has gained general acceptance in the scientific community. Id. (citing Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 593-94 (1993)). Satisfaction of one or more of these factors may suffice to admit the proposed evidence and the trial justice need not afford each factor equal weight. Owens, 838 A.2d at 892 (citing DiPetrillo, 729 A.2d at 689). We have emphasized, however, that "when the proffered knowledge is neither novel nor highly technical, satisfaction of one or more of these factors is not a necessary condition precedent to allowing the expert to testify." Id. "If the expert's evidence is not novel, then the foundation need not be novel either." DiPetrillo, 729 A.2d at 688 (quoting G. Michael Fenner, The Daubert Handbook: The Case, Its Essential Dilemma, and Its Progeny, 29 Creighton L. Rev. 939, 948 (1996)).

Here, the trial justice characterized the study of historical stone walls as a "new bod[y] of science." Accordingly, she stated that she was obligated to assess the reliability of Professor Thorson's methodology by examining its acceptability in the scientific community and its prior testing by peers. Based on Professor Thorson's responses during voir dire, the trial justice concluded that she was unable to determine whether the study of stone walls had acquired sufficient acceptance in the scientific community or been subject to peer review.

We initially pause over the trial justice's characterization of the study of stone walls as a novel field of science. Four years after we decided DiPetrillo, we again emphasized that satisfaction of DiPetrillo's reliability test is unnecessary when the principles underlying an expert's opinion are neither novel nor highly technical. See Owens, 838 A.2d at 892-93. In Owens, we held that an anesthesiologist's expert opinion was not inadmissible for lack of independent medical corroboration because the opinion was based on "well-established and scientifically valid principles of physiology." Id. at 893, 894. Indeed, we originally prophesied in DiPetrillo that trial justices would employ the four factors to assess the validity of scientific theories in cases such as "mass toxic torts, products liability, medical malpractice, environmental, criminal cases, or in the emerging fields of genetic engineering and organ harvesting, in which evidence of toxicology, epidemiology, immunology, risk analysis, or genetics to name a few may be presented." DiPetrillo, 729 A.2d at 686.

In contrast to these twenty-first century subjects of litigation, stone walls have appeared in the laws and jurisprudence of New England since colonial times. See Allegra di Bonaventura, Beating the Bounds: Property and Perambulation in Early New England, 19 Yale J.L. & Human. 115, 129 (2007). In particular, testimony on damages for the destruction of stone walls is not a novel feature of litigation in Rhode Island courts. See Sweeney v. Brow, 40 R.I. 281, 290, 100

- 17 -

A. 593, 595 (1917) (upholding award of damages for the cost of rebuilding a stone wall where there was testimony upon which trial justice could have based award); Chapman v. Pendleton, 34 R.I. 160, 170, 82 A. 1063, 1067 (1912) (jury's award of damages for town's destruction of stone wall was not excessive where question "was clearly a matter for the jury to determine upon the testimony"). Furthermore, Professor Thorson's stone wall theories in the instant matter appear to have their foundations in well-established principles of sedimentology, geology, hydrology, and geochemistry. Professor Thorson clarified that there is "no formalized discipline yet for stone wall science[,] but it's * * * part of * * * historic above ground archeology and that is a legitimate science."

Nonetheless, even if we accept the trial justice's assertion that the study of stone walls is a novel science, we ultimately conclude that the trial justice erred in excluding Professor Thorson's testimony because she applied an overly rigid standard for the admission of expert opinions. As we have previously explained, the factors mentioned in DiPetrillo were intended "to liberalize the admission of expert testimony by providing a mechanism by which parties can admit new or novel scientific theories into evidence that may have previously been deemed inadmissible." Owens, 838 A.2d at 892 (citing 1 David L. Faigman et al., Modern Scientific Evidence, § 1-3.4 at 26 n.74 (2002)). The party seeking to admit expert testimony need only demonstrate that the expert arrived at his or her conclusions in a "scientifically sound and methodologically reliable manner." Id.

We have previously found an abuse of discretion on the part of a trial justice when his or her overly stringent application of the test for admissibility of expert testimony "impermissibly conflate[s] [his or] her own functions with those of the jury." Gallucci, 709 A.2d at 1064; see Owens, 838 A.2d at 899 ("In deciding whether to admit proffered expert testimony, the trial

justice must take care not to interfere with the jury's role as the trier of fact."). If "the evidence presented to support the expert's proposed opinions is sufficient to allow a reasonable juror to conclude that his * * * methods are grounded in valid science, then cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the appropriate means of attacking the reliability of this evidence." Owens, 838 A.2d at 899-900 (citing Daubert, 509 U.S. at 596). "Thereafter, the jury [can] * * * decide[] how much weight—if any—to give [an expert's] opinions in light of the dearth of peer-reviewed studies and published protocols to corroborate his [or her] specific theories * * *." Id. at 900.

During voir dire, the trial justice questioned Professor Thorson about whether his theories on stone walls had undergone peer review. Professor Thorson replied:

> "I have not submitted a journal article for anonymous peer review * * * in part because there is no journal for stone wall studies. * * * I mean pieces of [his book] have been peer reviewed in articles dealing with wetland and landscape.
>
> "You can also argue that the[re is] widespread acceptance by my scientific peers [in that] it's been featured at meetings[;] it's sold in agency book stores. * * * There is no peer review process for books that are published in the same way that there are journal articles * * *. You can argue peer review in the sense that the book is in the twelfth printing and I am invited by academies to speak at their conferences about this. You can say it's not peer reviewed. If you think about the narrower definition * * * that * * * there is no journal."

From Professor Thorson's response, it is clear that, although his books on stone walls did not undergo a formal peer review, his peers have provided positive commentary and feedback on his work. He specifically indicated that one of his books on stone walls had received endorsements from scientific professionals, scholars, and historians. Professor Thorson further explained that, while his theories have not undergone statistical testing for error, they have been tested anecdotally.

- 19 -

Professor Thorson's credentials gave additional assurance of the reliability of his underlying methods. See In re Mackenzie C., 877 A.2d 674, 684 (R.I. 2005) ("The court may also consider the qualifications of the expert in determining whether the underlying methods are reliable." (quoting Owens, 838 A.2d at 891-92)). Professor Thorson is a professor of geology at the University of Connecticut with a Ph.D. in geology from the University of Washington. He has been studying stone walls since 1984 and published three books on the subject, as well as numerous articles. Two of those books won awards in their respective genres. In addition, he has previously testified in court concerning stone walls. With such qualifications, there is no danger that Professor Thorson is a "charlatan or a purveyor of junk science." See Gallucci, 709 A.2d at 1064.

There was sufficient evidence to allow a reasonable juror to find that Professor Thorson's methods were grounded in valid and reliable science. Thus, any lack of formalism in the peer review of Professor Thorson's theories should have been for the jury to consider in weighing his testimony. Accordingly, we hold that the trial justice abused her discretion in precluding Professor Thorson's expert testimony on the subject of historic stone walls. Since the trial justice's denial of plaintiff's request to amend and her grant of a judgment as a matter of law on count 3 were predicated upon plaintiff's failure to offer proof of damages, the trial justice's exclusion of Professor Thorson's testimony was so prejudicial as to constitute reversible error and require a new trial on that count.

**B**

**Judgment as a Matter of Law on Count 2**

In ruling on defendant's motion for a judgment as a matter of law on count 2, the trial justice found that plaintiff's evidence of damages was insufficient to go to the jury because there

was no proof of the value of the trees at the time of injury. The plaintiff argues that under the proper standard for Rule 50, he was entitled to an inference that the replacement cost of the trees was based on prices in existence at the time of injury. He points out that Mr. Largess was never asked and did not testify as to the dates of the replacement costs. Thus, plaintiff argues that it was pure speculation for the trial justice to conclude that the estimate of damages was not based on data from 2001.

"When confronted with a motion for judgment as a matter of law, the trial justice must * * * draw from the record all reasonable inferences that support the position of the nonmoving party." McGarry v. Pielech, 47 A.3d 271, 285 (R.I. 2012) (citing Oliveira v. Jacobson, 846 A.2d 822, 829 (R.I. 2004)). The trial justice is precluded from weighing the evidence or evaluating the credibility of witnesses. See Rule 50. We recently explained that "[t]his deference is required because of the weighty consequences attendant to granting a Rule 50 motion—it removes the case from the jury's consideration upon a finding that the nonmoving party failed to present legally sufficient evidence to permit the trier of fact to reach a favorable verdict." McGarry, 47 A.3d at 285 (citing Gianquitti, 973 A.2d at 590). Thus, "we will reverse a trial justice's grant of a motion for judgment as a matter of law when the trial justice has 'invaded the province of the jury' by impermissibly finding facts * * * or 'by weighing the evidence and assessing the credibility of witnesses[.]'" Gianquitti, 973 A.2d at 590 (quoting Hanson v. Singsen, 898 A.2d 1244, 1248 (R.I. 2006) and Franco, 916 A.2d at 1259).

In this case, the trial justice rested her decision to grant a judgment as a matter of law in defendant's favor on several assumptions. First, she assumed that Mr. Largess had made inquiries of nurseries sometime between 2005 and 2009, the timeframe during which Mr. Largess visited plaintiff's property. She further assumed that, when Mr. Largess made those

inquiries, he did not specifically ask the nurseries to provide him with an estimate of what it would have cost for a replacement tree in 2001. Finally, the trial justice assumed that the removal of the trees occurred in 2001.

After reviewing the relevant evidence, we conclude that the trial justice's assumptions were improper. While it was undisputed that Mr. Largess visited plaintiff's property between August 2005 and January 15, 2009, Mr. Largess did not specify the dates on which he made inquiries of nurseries. Nor did he indicate whether he had specifically requested that the nurseries provide him with prices from 2001. Moreover, we note that there was some variation in the testimony of the various witnesses concerning the exact dates of the injury. Morabit stated that he first noticed the destruction of his property in the "early 2000s," while Mr. Largess placed the time of injury sometime around 2001 to 2002. Ms. Steere testified that the removal of the trees occurred between 1999 and 2003, with additional alteration of the stone wall occurring as late as 2008. Accordingly, the date of injury and the date of the estimate of damages were factual questions properly left for the jury's resolution.

The trial justice also appears to have exceeded the permissible bounds of a Rule 50 motion when she assessed the credibility of Mr. Largess's testimony on damages. She stated that, in the absence of any evidence that someone had actually counted the missing trees before their removal, Mr. Largess's estimate of 190 trees lacked sufficient certainty. The trial justice added that "[t]he rest of the [Purdue] formula in many respects, in spite of what [Mr. Largess] says, in this Court's opinion is based upon subjective assessment, particularly in this case where he guesstimates never having seen the trees that were missing." She highlighted her particular concern that Mr. Largess may have overestimated plaintiff's damages by assigning values of 100 percent for condition and location class.

"The 'task of assessing compensatory damages is peculiarly within the province of the jury * * *.'" Castellucci v. Battista, 847 A.2d 243, 249 (R.I. 2004) (quoting Soares v. Ann & Hope of Rhode Island, Inc., 637 A.2d 339, 349 (R.I. 1994)). "[D]amages will not be denied merely because they are difficult to ascertain." Marketing Design Source, Inc. v. Pranda North America, Inc., 799 A.2d 267, 273 (R.I. 2002) (quoting Sea Fare's American Cafe, Inc. v. Brick Market Place Associates, 787 A.2d 472, 478 (R.I. 2001)). A complaining party need not prove damages with "mathematical exactitude[.]" Butera v. Boucher, 798 A.2d 340, 350 (R.I. 2002). "[A]ll that is required is that they are based on reasonable and probable estimates." Id. (citing Rhode Island Turnpike and Bridge Authority v. Bethlehem Steel Corp., 119 R.I. 141, 167-68, 379 A.2d 344, 358 (1977)).

While the trial justice's concerns about Mr. Largess's estimate were not unfounded, such concerns go to the weight of the evidence. The failure to count the trees prior to their removal does not take Mr. Largess's assessment outside the range of reasonable and probable estimates. Mr. Largess explained both how he arrived at his estimate of 190 missing trees and why he assigned 100 percent values for the missing tupelo trees. Defense counsel then had an opportunity to point out some of the weaknesses in Mr. Largess's estimate. The jury could have properly considered these factors in arriving at a measure of damages, if any, that would fairly compensate plaintiff for his loss. If the jury returned an award which the trial justice concluded was excessive in light of the evidence presented at trial, she could have rejected the jury's award on a motion for a new trial or ordered a remittitur. See Reccko v. Criss Cadillac Co., 610 A.2d 542, 546 (R.I. 1992). On a Rule 50 motion, however, it was reversible error for the trial justice to invade the province of the jury by weighing Mr. Largess's testimony and making findings of fact. Accordingly, a new trial is also necessary on count 2.

Since there was significant debate during the proceedings below about whether the diminution in the fair market value of Morabit's property was a more appropriate measure of damages, we take this opportunity to offer guidance on remand as to the acceptable methods of valuing trees. Section 34-20-1 entitles the landowner to damages in an amount equal to double "the value of any tree" cut, destroyed, or removed. The appropriate methods for determining the value of a tree under § 34-20-1 is an issue of first impression for this Court.[13] Fortunately, many of our sister states have spoken on this issue.

Our review of relevant jurisprudence suggests that the most sensible approach focuses on the use of the trees and their intrinsic value to the property. See, e.g., Evenson v. Lilley, 282 P.3d 610, 614 (Kan. 2012) (citing Mosteller v. Naiman, 7 A.3d 803 (N.J. Super. Ct. App. Div. 2010)). For commercial trees whose primary value derives from their use as a commodity, the assessment of damages is relatively straightforward. For example, damages may be assessed using the fair market value of timber, lumber, or other wood products. See Bangert v. Osceola County, 456 N.W.2d 183, 190 (Iowa 1990); see also Shea v. Brando Associates, 621 A.2d 184, 185 (R.I. 1993) (mem.) (trial justice was not clearly wrong in allowing the approximate value of cord wood as the measure of damages).

The assessment of damages becomes more complex when the trees' value derives not from their use as a commodity but from their unique contributions to the land or the landowner. In acknowledgement of this complexity, other courts faced with the task of determining the appropriate measure of damages for noncommercial trees have stressed the need for flexibility. See Evenson, 282 P.3d at 614; Mosteller, 7 A.3d at 808; see also Bangert, 456 N.W.2d at 189

_____

[13] In White v. LeClerc, 444 A.2d 847 (R.I. 1982), we expressly declined to address this question since the parties had impliedly consented to replacement value as the appropriate measure of damages. See id. at 849 n.3.

("it 'is impossible to state a simple, all-purpose measure of recovery for loss of trees'" (quoting Laube v. Estate of Thomas, 376 N.W.2d 108, 109 (Iowa 1985)); Glavin v. Eckman, 881 N.E.2d 820, 825 (Mass. App. Ct. 2008) (where fair market value was not adequate compensation for loss of trees, trial judge had "broad discretion" to allow jury to consider other evidence of damages). Accordingly, we do not consider it wise to adopt a single uniform measure of damages for § 34-20-1. Instead, we synthesize below some of the guiding principles and relevant factors for fashioning an appropriate measure of damages for the loss of noncommercial trees and shrubs.

As a starting point, we note that courts have permitted landowners to recover damages in excess of the diminution in the fair market value of the property when the removed trees or shrubs had a peculiar value to the landowner or made a unique contribution to the property. See 25 C.J.S. Damages § 154 (2013) (citing Vaught v. A.O. Hardee & Sons, Inc., 623 S.E.2d 373 (S.C. 2005), and Kallis v. Sones, 146 Cal.Rptr. 3d 419 (Cal. Ct. App. 2012)). In so holding, courts have frequently cited to the Restatement (Second) Torts § 929 which provides, in relevant part:

> "(1) If one is entitled to a judgment for harm to land resulting from a past invasion and not amounting to a total destruction of value, the damages include compensation for
>
> "(a) the difference between the value of the land before the harm and the value after the harm, or at his election in an appropriate case, the cost of restoration that has been or may be reasonably incurred[.]" Restatement (Second) Torts § 929 at 544 (1979) (emphasis added).

The comment to § 929(1)(a) explains:

> "If * * * the cost of replacing the land in its original condition is disproportionate to the diminution in the value of the land caused by the trespass, unless there is a reason personal to the owner for restoring the original condition, damages are measured only by the difference between the value of the land before and after the harm." Id. § 929, cmt. b at 545-46.

- 25 -

Thus, to determine when restoration costs in excess of the diminution of the value of the property may be appropriate, courts have focused on whether there is a "reason personal" to the landowner for restoring the trees and shrubs. See, e.g., Osborne v. Hurst, 947 P.2d 1356, 1359 (Alaska 1997); Kallis, 146 Cal.Rptr. 3d at 423; Lampi v. Speed, 261 P.3d 1000, 1005 (Mont. 2011); Morris v. Ciborowski, 311 A.2d 296, 299 (N.H. 1973); Vaught, 623 S.E.2d at 377. Whether there is a reason personal to the landowner or a peculiar value of the trees are ordinarily factual questions for the jury to resolve. Lampi, 261 P.3d at 1008; see Osborne, 947 P.2d at 1360.

We observe that restoration costs are most consistently allowed in cases where the parcel is of a relatively small size and the trees make a conspicuous contribution to the land, such as shade and ornamental trees on residential lots. For example, one court allowed replacement costs in excess of the diminution in value where the removed trees had shaded the plaintiffs' entire home and provided their grandchildren with a playhouse. See Kallis, 146 Cal.Rptr. 3d at 423. Similarly, restoration costs were deemed appropriate where the destroyed trees provided privacy and a natural fence for pets, see Gross v. Jackson Township, 476 A.2d 974, 976 (Pa. Super. Ct. 1974), and where the trees had "historic" and "sentimental" value. See Bangert, 456 N.W.2d at 190; cf. Mosteller, 7 A.3d at 808-09 (reasoning that decreases in attractiveness, privacy, and shade, and increases in risks of erosion and infestation were typical consequences from loss of trees and therefore did not demonstrate peculiar value of trees). Even where the trees' removal increased the value of the property, restoration costs were permitted when the plaintiffs had specifically planted the trees to beautify the property according to their tastes. See Threlfall v. Town of Muscoda, 527 N.W.2d 367, 371-73 (Wis. Ct. App. 1994).

In contrast, in Morabit's case, the missing trees were located on a relatively large tract of unimproved indigenous forestland. In such instances, courts have appeared more reluctant to allow restoration costs. The Kansas Supreme Court held that replacement costs were an inappropriate measure of damages for the destruction of 200 trees on a 160 acre parcel. Evenson, 282 P.3d at 617. In that case, the plaintiffs used the land for hunting, camping, and recreation. Id. at 612. In upholding the lower court's decision to limit the plaintiffs' recovery to the diminution in the value of the land, the Kansas Court reasoned that the plaintiffs had failed to show that the trees were important to their hunting, picnicking, and recreational activities. See id. at 616.

Nonetheless, other courts have allowed replacement costs in excess of the diminution in value of the property even where the trees were indigenous species on unimproved acreage. See Heninger v. Dunn, 162 Cal.Rptr. 104, 108-09 (Cal. Ct. App. 1980); Vaught, 623 S.E.2d at 374, 378. As one court poetically but persuasively explained:

> "One person's unsightly jungle may be another person's enchanted forest; certainly the owner of such land should be allowed to enjoy it free from a trespasser's bulldozer. Indeed, a trespasser should not be allowed, with impunity, to negligently or willfully wreak havoc on a landowner's natural woods, and the landowner's attempted recovery for such injury should not be entirely frustrated by the fact that the market does not reflect his personal loss." Vaught, 623 S.E.2d at 377 (quoting Keitges v. VanDermeulen, 483 N.W.2d 137, 143 (Neb. 1992)).

In Keitges, 483 N.W.2d at 138-39, the Nebraska Supreme Court held that restoration costs were an appropriate measure of damages for the loss of approximately 100 trees on ten unimproved acres. The court rejected the defendant's argument that it should limit a landowner's damages in cases where the removed trees are random indigenous growth, rather than transplanted ornamental species. See id. at 143. The Nebraska Court reasoned that the plaintiff-landowner,

who possessed a degree in biological science, had a particular reason for restoring his land since he had testified that he used the forestland for nature walks and studies. See id.

As a final consideration, we express our agreement with those jurisdictions which have placed an overall limit of reasonableness on restoration costs. Even when a landowner has offered sufficient proof of a peculiar value to justify an award of restoration costs in excess of the diminution in value, that award may not be unreasonable in relation to the change in the value of the property. See, e.g., Osborne, 947 P.2d at 1360; Ritter v. Bergmann, 891 N.E.2d 248, 257 (Mass. App. Ct. 2008); Mosteller, 7 A.3d at 809.[14] The overall goal is to place the injured landowner as near as possible to his or her pre-injury position, not to grant the landowner a windfall. Lampi, 261 P.3d at 1004; Evenson, 282 P.3d at 617.

Applying these principles to the case at hand, we note that there was at least some evidence introduced at trial to suggest that the removed trees had peculiar value and that Morabit had personal reasons for keeping the property unimproved. We stress, however, that the trial justice's concern to avoid granting plaintiff a windfall was both relevant and well-founded. As the trial justice pointed out on more than one occasion, neither party introduced any evidence of the diminution in the fair market value of Morabit's property. On remand, such evidence would be relevant to assess the reasonableness of Mr. Largess's estimate.

Because we conclude that the trial justice committed reversible errors necessitating a new trial on both counts, we need not address the plaintiff's remaining allegations of error.

---

[14] In addition, some courts have suggested that the fair market value of the entire parcel prior to the trees' removal should serve as a ceiling on damages. See Keitges v. VanDermeulen, 483 N.W.2d 137, 143 (Neb. 1992); Vaught v. A.O. Hardee & Sons, Inc., 623 S.E.2d 373, 378 (S.C. 2005).

## V

### Conclusion

For the reasons set forth in this opinion, we vacate the judgment of the Superior Court and remand the case for a new trial. The papers in this matter are remanded to the Superior Court for further proceedings consistent with this opinion.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**      George E. Morabit v. Dennis Hoag.

**CASE NO:**               No. 2010-77-Appeal.
                                    (WC 05-264)

**COURT:**                 Supreme Court

**DATE OPINION FILED:**  November 26, 2013

**JUSTICES:**              Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**          Associate Justice Gilbert V. Indeglia

**SOURCE OF APPEAL:**  Washington County Superior Court

**JUDGE FROM LOWER COURT**:

                                    Associate Justice O. Rogeriee Thompson

**ATTORNEYS ON APPEAL:**

                                    For Plaintiff:  Maureen Souza, Esq.

                                    For Defendant:  Arthur E. Chatfield, III, Esq.