**Supreme Court**

No. 2013-344-Appeal.
(PB 07-1995)

Ferris Avenue Realty, LLC       :

v.                     :

Huhtamaki, Inc., et al.         :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Ferris Avenue Realty, LLC        :

v.        :

Huhtamaki, Inc., et al.        :


Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Robinson, for the Court.**  This case arose from the refusal of the defendant Huhtamaki, Inc. (Huhtamaki) to indemnify the plaintiff, Ferris Avenue Realty, LLC (Ferris), after Ferris incurred certain costs related to the cleanup of hazardous substances.  After a thirteen-day trial, the jury found in favor of Ferris.  On appeal, Huhtamaki argues that the trial justice erred in: (1) construing an indemnity agreement executed by the parties; (2) admitting certain testimony from Ferris's expert witness; (3) admitting allegedly spoliated evidence; (4) instructing the jury; and (5) permitting Ferris to rely upon what Huhtamaki contends was "a pyramid of inferences" as it sought to prove its case.

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

**I**

**Facts and Travel**

On May 22, 2003, Ferris purchased from Huhtamaki approximately twenty-two acres of property located in East Providence (the Property).  At the time of that purchase, the parties executed a document entitled "Indemnity Agreement Regarding Hazardous Materials" (the

- 1 -

Indemnity Agreement).[1]    Simply put, the Indemnity Agreement provided that, upon the occurrence of certain conditions, Huhtamaki would reimburse Ferris for environmental cleanup costs.

Thereafter, in 2005, Ferris sought to build a residential complex on a section of the Property referred to by both parties as Parcel A.[2]   Accordingly, the firm of Vanasse, Hangen, Brustlin, Inc. (VHB) was hired to inspect the entire Property, including Parcel A.  In the course of its inspection, VHB conducted soil and groundwater testing on samples taken from Parcel A. Analysis of those samples revealed that Parcel A's soil and groundwater were contaminated with hazardous substances in amounts that violated the minimum quality standards established and enforced by the Rhode Island Department of Environmental Management (DEM).  Specifically, VHB discovered in the samples certain chlorinated industrial solvents including "1,1,1-tricholoethane" (TCA) and "tetrachloroethylene" (PCE).[3]

On December 19, 2005, after finding the just-referenced hazardous substances in the soil and groundwater samples taken from Parcel A, VHB submitted a plan to DEM, in which it reported the presence of hazardous substances on Parcel A and proposed a remediation plan; that proposed plan included excavating the contaminated soil.  Very shortly after that plan was

---

[1]    The Indemnity Agreement is discussed further in Part III.A, infra.

[2]    Parcel A consists of 4.5 acres located at the northeast extremity of the Property.

[3]     The substance referred to as PCE throughout this opinion (and in many of the documents referenced herein) is known variously as "perchloroethylene," "tetrachloroethylene," and "tetrachloroethene."  We recognize that two of the names by which PCE is known ("tetrachloroethylene" and "tetrachloroethene") are spelled in a confusingly similar way.

submitted, on December 21, 2005, DEM sent a missive entitled "Letter of Responsibility"[4] to both Ferris and Huhtamaki.[5] That letter indicated, <u>inter alia</u>, that hazardous substances, including PCE, had been found on the Property.

On January 30, 2006, over a month after the Letter of Responsibility was sent, Ferris began excavating the affected soil from Parcel A; the process of excavation continued until February 10, 2006. Shortly thereafter, in a letter dated February 14, 2006, Ferris advised Huhtamaki that it was "being notified herein, pursuant to Section 6 of the Indemnity Agreement, of the claim or demand by RIDEM and the fact that [Ferris] has and will incur costs and expenses for which you [Huhtamaki] are responsible under the terms of the Indemnity Agreement." Huhtamaki responded in a letter dated March 10, 2006, in which it refused to indemnify Ferris on the ground that the latter company had "failed to provide notice with reasonable promptness," which Huhtamaki contended was required by the Indemnity Agreement. After Huhtamaki's refusal, Ferris filed a complaint in the Superior Court for Providence County, on April 16, 2007, thereby commencing the present litigation. Huhtamaki answered in due course and asserted several counterclaims.

**A**

**Ferris's Motion for Partial Summary Judgment**

On October 22, 2010, after both parties had engaged in substantial discovery, Ferris moved for partial summary judgment, seeking a favorable ruling as to what it characterized as

---

[4] Some of the documents referenced in this Court's discussion have headings which use all capital letters, are underlined, or employ bold-face type. We have conformed those headings to our usual style throughout this opinion.

[5] It was established in the course of litigation that DEM sent the Letter of Responsibility to Huhtamaki in error due to the fact that DEM believed that Huhtamaki still operated the Property. Nevertheless, it is uncontested that Huhtamaki received and reviewed the Letter of Responsibility.

the "validity and enforceability of the Indemnity Agreement;" in due course, that motion was granted. The trial justice[6] rejected Huhtamaki's contention that it could not possibly be liable to Ferris because, under Huhtamaki's interpretation of the Indemnity Agreement, Ferris was entitled to assert a claim for indemnification only in connection with third-party actions.

For the trial justice to be able to pass upon Ferris's right (vel non) to assert a claim for indemnification for voluntarily incurred cleanup costs (as opposed to a claim for those cleanup costs that might be required by a third party like DEM), he was required to determine which part of Section 6 of the Indemnity Agreement applied—i.e., did Section 6(c) or Section 6(a) control? Ferris argued that Section 6(c) clearly constituted a vehicle for it to assert indemnification claims against Huhtamaki with respect to the cleanup costs incurred by Ferris in January and February of 2006. Section 6(c) reads in pertinent part as follows:

> "6. Procedure. All claims for indemnification by a party under this Agreement shall be asserted and resolved as follows:
>
> "* * *
>
> "(c) If [Ferris] should have a claim against [Huhtamaki] hereunder which does not involve a claim or demand being asserted against or sought to be collected from it by a third party, [Ferris] shall send a Claim Notice with respect to such claim to [Huhtamaki]. If [Huhtamaki] disputes such claim, such dispute shall be resolved by litigation in an appropriate court of competent jurisdiction." (Emphasis added.)

On the basis of this language, Ferris argued that the Indemnity Agreement sets forth a procedure for Ferris to bring a claim for indemnification on its own behalf.

---

[6] Since the same judicial officer presided over both the motion for partial summary judgment and the subsequent trial, we shall refer to him throughout as the trial justice.

- 4 -

By contrast, Huhtamaki stoutly maintained that, pursuant to the Indemnity Agreement, Ferris was authorized to assert a claim for indemnification only in connection with actions initiated against it by a third party pursuant to Section 6(a) of the Indemnity Agreement.

After asserting that Section 6(a) rather than Section 6(c) applied,[7] Huhtamaki (in both its memorandum in opposition to Ferris's motion for partial summary judgment and in its counterclaim for breach of contract) contended that, even if Ferris could recover under the Indemnity Agreement for claims not associated with third parties, Ferris had not complied with the requisite "Claim Notice" provisions contained in Section 6(a). Section 6(a) reads, in pertinent part, as follows:

> "(a) In the event that any claim or demand for which [Huhtamaki] would be liable to [Ferris] * * * is asserted against or sought to be collected from [Ferris] by a third party, [Ferris] shall with reasonable promptness give notice (the 'Claim Notice') to [Huhtamaki] of such claim or demand, specifying the nature of and specific basis for such claim or demand and the amount or the estimated amount thereof to the extent then feasible * * *. [Huhtamaki] shall not be obligated to indemnify [Ferris] under this Agreement with respect to any such claim or demand if [Ferris] fails to notify the [Huhtamaki] thereof in accordance with the provisions of this Agreement, and, as a result of such failure, [Huhtamaki's] ability to defend against the claim or demand is materially prejudiced. [Huhtamaki] shall have ten (10) days from the delivery or mailing of the Claim Notice (the 'Notice Period') to notify [Ferris] (i) whether or not it disputes the liability * * * and (ii) whether or not it desires * * * to defend [Ferris] against such claim or demand * * *." (Emphasis added.)

Referencing the just-mentioned provision, Huhtamaki argued that, because Ferris sent the February 14, 2006 "Claim Notice" letter after it had excavated the soil in question, Ferris had not complied with the "reasonable promptness" requirement contained in Section 6(a). Huhtamaki

---

[7] In seeking to explain what purpose is served by Section 6(c), Huhtamaki contended, rather delphically, that Section 6(c), when read "in context," applies only "to claims of [Ferris] that are not sought by a third party, but which must still be necessary response costs reasonably incurred by [Ferris] that are necessarily associated with such a mandatory action."

added that it was "prejudiced" in that it did not have the opportunity to clarify with DEM what actions were required on the property to "protect the public health."

With respect to the notice issue, Ferris contended that, because Section 6(c) states that Ferris is required simply to give "Claim Notice" to Huhtamaki, the "reasonable promptness" requirement embodied in Section 6(a) was not applicable. Ferris further argued that, even if Section 6(a) applied, there had de facto been reasonably prompt notice because Huhtamaki had received DEM's Letter of Responsibility at a point in time before the process of removing the contaminated soil began.

As previously indicated, the trial justice granted Ferris's motion for partial summary judgment with respect to the issue of whether the Indemnity Agreement provided Ferris with a right to seek indemnification for its own claims (as opposed to a claim for those cleanup costs that might be required by a third party).[8] The trial justice's lengthy decision dated February 18, 2011 grapples in a scholarly manner with the competing contentions of the parties as to that issue. Relevant to our analysis here, he held that Section 6(c), rather than Section 6(a), controlled—because he viewed Section 6(c) as expressly setting out the procedure for Ferris to initiate its own claims for indemnification against Huhtamaki.

In addressing Huhtamaki's breach of contract counterclaim (in which Huhtamaki alleged that Ferris had breached the Indemnity Agreement by failing to provide the requisite "Claim Notice"), the trial justice found that the "reasonable promptness" requirement was not embodied in Section 6(c). The trial justice then determined that "the February 14, 2006 letter from [Ferris]

---

[8]    The trial justice also granted Ferris's motion for summary judgment with respect to all five counts contained in Huhtamaki's counterclaims. Huhtamaki had asserted counterclaims for: (1) fraudulent inducement; (2) fraudulent misrepresentation; (3) negligent misrepresentation; (4) breach of contract; and (5) breach of the implied covenant of good faith and fair dealing.

to [Huhtamaki] fulfilled the notice requirements as specified by Section 6(c) of the Indemnity Agreement * * *."

Thereafter, Huhtamaki moved for reconsideration. The trial justice ultimately denied Huhtamaki's motion for reconsideration, but he nonetheless indicated by way of clarification that his earlier decision had undertaken "the narrow task of interpreting the Indemnity Agreement and determining whether [Ferris's] right to indemnification was limited to third-party actions, or whether the agreement also contemplated indemnification of [Ferris's] own claims." The trial justice further stated that Ferris would still have to establish the following at trial: "(1) whether hazardous substances or materials were located on the Property; (2) whether the hazardous substances or materials, if any, were on the Property prior to the [2003] Closing; (3) whether [Ferris] incurred costs or [d]amages as a result of the hazardous substances or materials; and (4) whether [Ferris's] costs or [d]amages, if any, were reasonably incurred."

**B**

**Huhtamaki's Motion <u>in</u> <u>Limine</u>**

Before trial, Huhtamaki moved <u>in</u> <u>limine</u> to exclude all evidence that had been derived from the soil excavated from Parcel A on the theory that there had been spoliation of evidence. At the November 5, 2012 hearing on that motion, Huhtamaki argued that Ferris's excavation deprived Huhtamaki of the ability to conduct its own tests and to challenge VHB's conclusion that the soil was contaminated. The trial justice denied Huhtamaki's motion seeking preclusion of the above-referenced evidence, but he allowed Huhtamaki to depose Ferris's expert with respect to the issue of spoliation. The trial justice also allowed Huhtamaki to designate an expert to testify on its behalf.

# C

## The Testimony at Trial

Thereafter, the case was tried before a jury over thirteen days in November and December of 2012. Although both parties presented multiple witnesses, only certain portions of the trial testimony are relevant to Huhtamaki's arguments on appeal. Accordingly, we summarize below the salient aspects of what occurred at trial in the order of their relevance to the claims on appeal.

### 1.	The Testimony of Timothy O'Connor

Timothy O'Connor, an environmental engineer with VHB, testified for Ferris at trial. Mr. O'Connor's testimony mainly addressed the voluminous environmental reports detailing the extensive environmental history of the Property.[9] Mr. O'Connor's testimony concerning that environmental history was mostly uncontested. However, Huhtamaki took issue with Mr. O'Connor's opinion that, based on his survey of the environmental history, the pollution which VHB found on Parcel A in 2005 was present at the time of the closing in 2003—said fact being one of the elements which Ferris had to prove at trial.

### i.	The Uncontested Testimony

Mr. O'Connor first reviewed the pertinent environmental history, focusing on three reports: (1) a 1986 Complaint to DEM and DEM's subsequent investigation; (2) a 1989

---

[9]	After Mr. O'Connor detailed his expertise in environmental engineering and the remediation of contaminated sites, Ferris offered him as an expert. Huhtamaki objected on the ground that there was a lack of foundation as to Mr. O'Connor's qualifications to opine on a key element that Ferris would be required to prove at trial—viz., whether the hazardous substances found on Parcel A in 2005 were present at the time of the closing in 2003. The trial justice excused the jury, heard arguments from both parties, and then ruled as follows: "[A]ssuming an appropriate foundation is laid by the plaintiff in connection with opinions sought from this witness, the witness will be permitted to give those opinions."

Preliminary Assessment also completed by DEM; and (3) a 1990 environmental report prepared by Szepatowski Associates, an environmental consulting firm (Szepatowski Report). The latter two reports all noted that hazardous wastes, including TCA and PCE, had been generated on the Property. Mr. O'Connor testified that, based on the factual assertions set forth in the 1986 DEM Complaint, DEM had, in Mr. O'Connor's words, "recommended the site to the Superfund program for assessment as potentially one of the nation's worst hazardous waste sites."[10] He added that, as a result of the 1986 DEM Complaint and the 1989 Preliminary Assessment, the federal Environmental Protection Agency (EPA) hired Roy F. Weston, Inc. (Weston) to determine whether the Property should be listed as a Superfund site. In its 1993 Final Site Inspection Report (the Weston Report), Weston stated that the testing of soil samples from Parcel A revealed the presence thereon of hazardous substances, including TCA and PCE. Mr. O'Connor then testified that the EPA ultimately opted not to list the Property on its National Priorities List, which list included the country's "worst hazardous waste sites."

It was further the testimony of Mr. O'Connor that the next environmental inspection in the Property's history was performed in August of 1997 by Integrated Chemical & Environmental Engineering (ICEE), an environmental consulting firm.[11] Mr. O'Connor testified

---

[10] "Superfund is the name given to the environmental program established [by Congress] to address abandoned hazardous waste sites. It is also the name of the fund established by the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended * * *." What is Superfund?, EPA.GOV, http://www.epa.gov/superfund/about.htm (last visited February 24, 2015).

[11] In 1997, The Chinet Company, which merged with Huhtamaki in 2001, had expressed interest in purchasing the Property from Nyman Manufacturing, Inc., the then-owner of the site, and it hired ICEE to assess the Property.

that ICEE's testing of soil and groundwater samples revealed levels of TCA in the soil that exceeded residential regulatory minimum standards.[12]

Mr. O'Connor testified that Nyman Manufacturing, Inc. (Nyman), the owner of the site at the time of ICEE's 1997 investigation, was required to report the findings to DEM because ICEE had found TCA levels which exceeded residential regulatory minimum standards, in addition to other hazardous substances on the Property. Along with its reporting the findings to DEM, in October of 1997, Nyman hired Paragon Environmental Services, Inc. (Paragon) to remediate the Property. After several excavations and two rounds of soil testing, Paragon found levels of PCE in the soil samples that exceeded allowable regulatory standards. Paragon also found low concentrations of PCE in the groundwater. On December 31, 1998, Paragon issued a Closure Report, which Mr. O'Connor explained is a "regulatory required document that is submitted at the end of a remedial action."[13] This Closure Report clearly stated that Paragon "did not intend for [its] study to be an exhaustive investigation of subsurface conditions on the site."

In response to Paragon's Closure Report, DEM issued a "no further action letter" dated October 31, 2000 (the No Further Action Letter). Mr. O'Connor testified that, while a letter of compliance "is intended to indicate that a site has been adequately addressed to the fullest extent of the regulations," no further action letters "are meant to be specific to one incident." Mr. O'Connor further explained that the issuance of a no further action letter simply signifies that DEM does not require a party to take further action related to a specific instance of pollution. In

---

[12]     Although ICEE also noted the presence of PCE in the groundwater, those levels of PCE did not violate the quality standards that were applicable at the time.

[13]     Mr. O'Connor testified that DEM did not mandate that additional excavation be conducted after Paragon's 1997-1998 investigation in view of the fact that any further excavation would be below the "groundwater table" and the applicable regulations did not apply to "a sample taken below the groundwater table."

fact, the No Further Action Letter pertinent to the instant case specifically states, in bold-face type, that it "is not a letter of compliance pursuant to remediation regulations."

Mr. O'Connor proceeded to testify that VHB performed the next environmental testing on Parcel A in 2005, the results of which ultimately gave rise to the present litigation. As previously explained, Ferris had sought to develop the Property for residential purposes, and VHB had been engaged to test soil and groundwater samples from Parcel A; that testing revealed that the soil and groundwater were contaminated with PCE in concentrations exceeding DEM's minimum regulatory quality standards. VHB's groundwater and soil testing also revealed concentrations of TCA, but at levels that did not surpass the applicable minimum standard. Mr. O'Connor testified that, as a result of VHB's soil and groundwater testing, VHB identified three areas of Parcel A for excavation, all of which areas lay beneath approximately ten feet of uncontaminated soil.

### ii.     The Contested Testimony

After Mr. O'Connor's extensive summary of the Property's environmental history, counsel for Ferris asked him to opine as to whether the hazardous substances that VHB found on Parcel A in 2005, specifically TCA and PCE, were present at the time of the real estate closing in 2003. Huhtamaki objected to this line of questioning, arguing that Mr. O'Connor did not have the requisite scientific expertise to render such an opinion. Huhtamaki was opposed to allowing Mr. O'Connor to testify as to this point undoubtedly because one of the elements which Ferris was required to prove at trial was whether the hazardous substances or materials found in 2005 were present on the Property at the time of the closing in 2003. After a voir dire examination of Mr. O'Connor was conducted, the trial justice concluded that the witness would be permitted to testify that the materials found in 2005 were also present in 2003. However, the trial justice

further ruled that Mr. O'Connor would not be permitted to offer an opinion as to exactly when the contaminates were first discharged onto Parcel A.

Mr. O'Connor then offered his expert opinion that the hazardous substances (TCA and PCE) which VHB found in 2005 were present on Parcel A in 2003. He explained that he based his opinion on: (1) the fact that the 1986 DEM Complaint, the 1989 Preliminary Assessment by DEM, the 1990 Szepatowski Report, and the 1993 Weston Report all documented the use of TCA and PCE at the facility; (2) the fact that the Weston, ICEE, and Paragon reports all documented the presence of TCA and PCE in the soil and groundwater samples from Parcel A; (3) the fact that VHB was remediating the same general area of the Property as had been examined by Weston, ICEE, and Paragon; and (4) the fact that VHB found the contaminated soils underneath ten feet of clean soil.

### 2. The Testimony of Dr. Paul Boehm

Endeavoring to counter Mr. O'Connor's expert testimony, Huhtamaki called Dr. Paul Boehm, an environmental forensic chemist, as an expert witness. Doctor Boehm described certain tests that, based on the substance's level of degradation, may allow a scientist to determine how long a substance has been in the environment. Doctor Boehm also testified that, once contaminated soils are removed from their natural state, any samples from those soils are "inappropriate for doing forensic testing" since a scientist needs to test the soil in its natural state in order to determine the lateral and vertical extent of any contamination.

### 3. The Testimony of Rochelle Stringer, Esq.

In addition to the testimony from the above-referenced experts, Attorney Rochelle Stringer, an employee of Huhtamaki who bore the title of general counsel, testified for Huhtamaki. Attorney Stringer testified that it was she who sent Ferris the March 10, 2006 letter

denying, on the basis of a purported lack of timely notice under the Indemnity Agreement, Ferris's claim for indemnification. She also testified that the allegedly untimely notice prevented Huhtamaki from testing the contaminated soil as it lay in its natural state in order to determine if the contaminants were on the Property at the time of the 2003 closing.

Attorney Stringer further testified that, after Huhtamaki received the Letter of Responsibility which had been sent by DEM, she directed Robert Steeves, Huhtamaki's corporate environmental manager, to contact DEM to ensure that that agency was aware that Huhtamaki was no longer the operator of the Property and, for that reason, had been sent the letter in error. Thereafter, in a letter which she wrote to DEM, dated January 6, 2006, Attorney Stringer memorialized Mr. Steeves's conversation with DEM to the effect that Huhtamaki had been sent the December 21, 2005 Letter of Responsibility by mistake.

On cross-examination, Attorney Stringer admitted that Huhtamaki had received the Letter of Responsibility from DEM and that, as of January 3, 2006 at the latest, she was aware that there was a report indicating that there had been a release of hazardous substances on the Property. She then admitted that, in spite of Huhtamaki's possible liability under the Indemnity Agreement, she had not contacted Ferris about the Letter of Responsibility or any potential cleanup.[14]

#### 4. The Testimony of Robert Steeves

Robert Steeves, Huhtamaki's corporate environmental manager, also testified for Huhtamaki. He confirmed that Attorney Stringer had provided him with a copy of the Letter of

---

[14] Huhtamaki did not contact Ferris until sending the March 10, 2006 letter, written by Attorney Stringer, in which Huhtamaki indicated that it refused to indemnify Ferris. As previously explained, that March 10, 2006 letter from Huhtamaki was sent in response to Ferris's February 14, 2006 letter seeking indemnification pursuant to the Indemnity Agreement.

Responsibility and had instructed him to "find out what was going on;" he testified that he then called DEM. He further testified that, as a result of his phone conversation with DEM, he understood that DEM "had received a report of some materials that the current site owner wanted to remove from the Property, and as a result of that report, they sent out [the] [L]etter of [R]esponsibility." He added that it was in March of 2006 that he learned that Ferris had actually excavated the soils.

## D

### Jury Instructions and Huhtamaki's Objections

In view of the fact that Ferris had excavated the contaminated soils before Huhtamaki could test them, the trial justice instructed the jury concerning the spoliation of evidence.[15] In the course of instructing the jury on spoliation, the trial justice stated:

> "If you find that Huhtamaki knew or should have known that [Ferris] planned to excavate the soils from Parcel A before [Ferris] did so, and that Huhtamaki had an opportunity to request that [Ferris] refrain from excavating the soil and allow Huhtamaki an opportunity to test it in the ground, and if you find further that Huhtamaki did nothing to stop [Ferris] from excavating the soil, then I instruct you that you may not infer that because the soil was destroyed that the evidence would have been unfavorable to [Ferris's] position in this case."

Huhtamaki objected to said instruction, arguing that it erroneously imposed a duty on Huhtamaki to take affirmative action to prevent the destruction of evidence.

Huhtamaki also objected to the trial justice's lack of an instruction as to the "Claim Notice" issue, arguing that whether or not Ferris had satisfied what Huhtamaki alleged was the

---

[15] Huhtamaki had argued in its motion in limine that, pursuant to the concept of spoliation, the jury should not have been allowed to consider any evidence pertaining to the condition of the soil excavated in 2006. Ferris, in contrast, argued that any issue with respect to spoliation was not present in the instant case. At the November 5, 2012 hearing, the trial justice had declined to rule in Huhtamaki's favor, without prejudice, until the court heard appropriate expert testimony. The allegedly spoliated evidence was eventually admitted at trial.

"reasonable promptness" requirement in the Indemnity Agreement was an issue of fact for the jury. However, the trial justice denied that objection, stating that his earlier "summary judgment decisions" had already determined that issue.

## E

### Jury Verdict and Huhtamaki's Post-Trial Motions

On December 13, 2012, after thirteen days of trial and approximately two hours of deliberations, the jury found Huhtamaki liable under the Indemnity Agreement for the environmental cleanup costs, and Ferris was awarded the amount of $251,121.06 in damages, plus interest and costs.[16] Huhtamaki appealed.

## II

### Issues on Appeal

Huhtamaki raises a number of issues in support of its appeal. First, it argues that the trial justice erred in holding that Ferris's February 14, 2006 letter constituted sufficient notice under the Indemnity Agreement. Second, Huhtamaki contends that the trial justice erred in permitting Mr. O'Connor to testify as to whether the contamination found in 2005 was present at the time of the closing in 2003. Third, Huhtamaki maintains that, pursuant to the concept of spoliation, the trial justice should have excluded all evidence relating to the soil samples that were taken from Parcel A in 2005. Fourth, it avers that the trial justice committed errors of law in instructing the jury. Finally, Huhtamaki asserts that Ferris's case was predicated upon a legally improper "pyramid of inferences."

---

[16]    The civil judgment form dated December 17, 2012 indicates that, in addition to the $251,121.06 in damages awarded by the jury, Huhtamaki was liable for $186,834.07 in interest and costs as of that date.

We address each issue in turn. Due to the fact that differing standards of review apply to the various issues on appeal, we shall recite the applicable standard as we address each issue.

## III

## Analysis

## A

### "Claim Notice"

Huhtamaki first argues that the trial justice erred in finding that Ferris's February 14, 2006 letter constituted sufficient "Claim Notice" pursuant to the terms of the Indemnity Agreement. On appeal, Huhtamaki admits that Section 6(c), which contains the contested "Claim Notice" term, governs the procedure for the present case.[17] However, Huhtamaki contends that "Claim Notice" is actually defined in Section 6(a) in such a way that "Claim Notice" is imbued by Section 6(a) with a meaning that stays with it wherever that term is thereafter encountered in the Indemnity Agreement.

As previously explained, Section 6(a) sets forth the procedure governing third-party claims under the Indemnity Agreement. In the event of a third-party claim, Section 6(a) requires that Ferris "with reasonable promptness give notice (the 'Claim Notice') to [Huhtamaki] of such claim or demand, specifying the nature of and specific basis for such claim or demand and the amount or the estimated amount thereof to the extent then feasible * * *." (Emphasis added.) Huhtamaki contends that the "reasonable promptness" requirement of Section 6(a) should be read into Section 6(c), due to the fact that it also uses the term "Claim Notice." Consequently, Huhtamaki argues, Ferris failed to meet the "reasonable promptness" requirement—because Ferris sent the February 14, 2006 letter to Huhtamaki only after having excavated the

---

[17] As indicated above, Huhtamaki adopted a different position in the Superior Court—viz., that Section 6(c) was inapplicable to Ferris's claim for indemnification. See Part I.A, supra.

- 16 -

contaminated soils from Parcel A.  Under Section 6(a), lack of reasonably prompt "Claim Notice" relieves Huhtamaki from its obligation to indemnify Ferris if Huhtamaki's "ability to defend against the claim or demand is materially prejudiced."  (Emphasis added.)  Huhtamaki contends that it was materially prejudiced because the lack of prompt notice prevented it from testing the contaminated soil on its own.  Accordingly, Huhtamaki contends that it was relieved from liability under the Indemnity Agreement and that the trial justice erred in granting partial summary judgment in Ferris's favor with respect to the "Claim Notice" issue.

### 1.     Standard of Review

This Court reviews the grant of summary judgment in a de novo manner.  DeMarco v. Travelers Insurance Co., 26 A.3d 585, 605 (R.I. 2011); see also Sola v. Leighton, 45 A.3d 502, 506 (R.I. 2012).  In conducting this review, "we employ the same rules and standards that the hearing justice used."  Estate of Giuliano v. Giuliano, 949 A.2d 386, 391 (R.I. 2008).  We will affirm the grant of summary judgment "[i]f we conclude, after viewing the evidence in the light most favorable to the nonmoving party, that there is no genuine issue of material fact to be decided and that the moving party is entitled to judgment as a matter of law * * *."  DeMaio v. Ciccone, 59 A.3d 125, 129 (R.I. 2013) (internal quotation marks omitted); see also Lynch v. Spirit Rent-A-Car, Inc., 965 A.2d 417, 424 (R.I. 2009).  We are also mindful of the principle that "[s]ummary judgment is an extreme remedy that should be applied cautiously."  Hill v. National Grid, 11 A.3d 110, 113 (R.I. 2011) (internal quotation marks omitted); see also Plainfield Pike Gas & Convenience, LLC v. 1889 Plainfield Pike Realty Corp., 994 A.2d 54, 57 (R.I. 2010).

### 2.     Huhtamaki Received Actual Notice

Even if we were to accept arguendo Huhtamaki's argument (based on the "defined term" concept) that "Claim Notice" as used in Section 6(c) incorporates the "reasonable promptness"

requirement that is explicitly set forth in Section 6(a) but not in Section 6(c),[18] Huhtamaki's argument is still unavailing—due to the crucial fact that it received actual notice of the pollution.[19] The Indemnity Agreement states that Huhtamaki is relieved from its obligation to indemnify Ferris if Huhtamaki's "ability to defend against the claim or demand is materially prejudiced" by the failure to provide proper notice. (Emphasis added.) Huhtamaki argues that it was materially prejudiced by what it views as belated notice because it received Ferris's February 14, 2006 letter after Ferris had excavated the contaminated soil. Accordingly, Huhtamaki argues that it was not able to conduct testing of the soil on its own in order to challenge the findings of the VHB company.

However, it is crystal clear from the record that Huhtamaki received express actual notice that hazardous substances had been found on the Property; such actual notice occurred when Huhtamaki received the Letter of Responsibility from DEM dated December 21, 2005. See In re Ryan, 851 F.2d 502, 506 (1st Cir. 1988) ("It would seem that one might properly be said to have actual notice when he has information in regard to a fact, or information as to circumstances an

---

[18] It not being necessary to reach the issue, we expressly decline to pass upon Huhtamaki's "defined term" argument. See Grady v. Narragansett Electric Co., 962 A.2d 34, 41-42 n.4 (R.I. 2009) (referencing "our usual policy of not opining with respect to issues about which we need not opine"). We similarly need not and therefore do not opine as to whether the February 14, 2006 letter satisfied the "reasonable promptness" criterion. See id.

[19] Huhtamaki argues on appeal that "Claim Notice" is a defined term that necessarily carries with it, from Section 6(a), the "reasonable promptness" requirement wherever "Claim Notice" appears in other sections of the Agreement (notably in Section 6(c)). However, in view of what Huhtamaki argued at the summary judgment stage, the crux of what the trial justice had to resolve in this regard was whether Section 6(a) or Section 6(c) applied. At no time at the summary judgment stage (or in its motion for reconsideration) did Huhtamaki argue to the trial justice that "Claim Notice" was a defined term with the same meaning in all sections of the Indemnity Agreement. Huhtamaki did eventually raise that particular hermeneutic argument in its Renewed Motion for Judgment as a Matter of Law and in its Motion for a New Trial. While this chronological reality might mean that the defined term argument has been sufficiently preserved for appellate review, it is nonetheless unavailing in view of the crucial consideration that Huhtamaki in fact received actual notice of the pollution.

investigation of which would lead him to information of such fact * * *.") (internal quotation marks omitted). The Letter of Responsibility indicated, among other things, that hazardous substances, including PCE, in excess of DEM regulations had been found on the Property. Additionally, Robert Steeves testified that, after a January 3, 2006 telephone conversation with DEM, he understood that DEM had sent the Letter of Responsibility as a result of the fact that the owner of the site (Ferris) had found contaminants on the Property and wanted to remove them. It follows that Huhtamaki was not materially prejudiced by any arguable delay in the sending of "Claim Notice" because it received actual notice of the pollution and was apprised of the likelihood of excavation. See, e.g., United States v. Aarons, 310 F.2d 341, 343, 345, 348 (2d Cir. 1962) (Friendly, J.) (holding that, because the defendants had actual knowledge of a Coast Guard order temporarily closing a portion of the Thames River at New London, they could be criminally prosecuted for violating the order, even though notice of the order had not been published in the Federal Register, as was expressly required by the Federal Register Act (44 U.S.C. §§ 301-314) and § 3(a) of the Administrative Procedure Act (5 U.S.C. § 1002(a))).[20]

In view of our conclusion that Huhtamaki was not materially prejudiced because it received actual notice of the pollution and was therefore not relieved of its obligations under the Indemnity Agreement, we affirm the trial justice's grant of partial summary judgment with respect to the right of Ferris to pursue an indemnification claim for the cleanup costs.

---

[20]    The Second Circuit opinion that is cited in the text, United States v. Aarons, 310 F.2d 341, 348 (2d Cir. 1962), contains the following memorably lapidary statement: "If a person has actual notice of a rule, he is bound by it."

## B

## The Contested Testimony of Timothy O'Connor

Next, Huhtamaki contends that the trial justice abused his discretion in permitting the plaintiff's expert, Timothy O'Connor, to opine that the TCA and PCE, which the VHB company found on Parcel A in 2005, had been present on Parcel A in 2003. According to Huhtamaki, Mr. O'Connor lacked the expertise to opine as to the length of time that any hazardous substance may have been present on the Property. It was Huhtamaki's contention that only a forensic chemist, with knowledge of chemical degradation rates, could offer such an opinion.

It is well settled that "[t]his Court will not disturb a trial justice's ruling on the admissibility of expert testimony absent an abuse of discretion." Gallucci v. Humbyrd, 709 A.2d 1059, 1064 (R.I. 1998). Pursuant to Rule 702 of the Rhode Island Rules of Evidence, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of * * * [an] opinion." Nonetheless, "[b]ecause novel scientific or complex technical evidence is often difficult for the factfinder to evaluate, such evidence runs the risk of being both powerful and quite misleading." Morabit v. Hoag, 80 A.3d 1, 11 (R.I. 2013) (internal quotation marks omitted). As a result, "[w]hen a party seeks to introduce, through expert testimony, novel scientific or complex technical evidence, it is proper for the trial justice to exercise a gatekeeping function." Owens v. Silvia, 838 A.2d 881, 891 (R.I. 2003).

In DiPetrillo v. Dow Chemical Co., 729 A.2d 677 (R.I. 1999), we itemized four nonexclusive factors for a trial justice to consider in deciding whether or not to admit novel or highly technical expert testimony: "(1) whether the proffered knowledge can be or has been

tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the theory or technique has gained general acceptance in the relevant scientific field." Id. at 689 (citing Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 593-94 (1993)); Morabit, 80 A.3d at 12. According to Huhtamaki, Mr. O'Connor's testimony regarding the presence of TCA and PCE on the Property in 2003 failed to satisfy any of those factors.

It is noteworthy, however, that in Morabit this Court expressly indicated that "when the proffered knowledge is neither novel nor highly technical, satisfaction of one or more of these factors is not a necessary condition precedent to allowing the expert to testify." Morabit, 80 A.3d at 12 (internal quotation marks omitted). In Morabit, the plaintiff brought suit against a neighbor for damages stemming from, inter alia, the neighbor's alleged destruction of a historic stone wall marking the border between their respective properties. Id. at 3-4. The plaintiff then offered as an expert a professor of geology from the University of Connecticut whose focus of study was historic stone walls. Id. at 5. The trial justice recognized the professor as being an expert in geology, but she precluded him from presenting any testimony that would be based on "stone wall science." Id. The trial justice reasoned that "the study of historic stone walls was unreliable because it had not garnered sufficient acceptance in the scientific community or been subjected to adequate peer review." Id. at 5-6. This Court reversed, contextualizing the holding in DiPetrillo, supra, and noting that "satisfaction of DiPetrillo's reliability test is unnecessary when the principles underlying an expert's opinion are neither novel nor highly technical." Id. at 12.

As was the case with respect to the expert testimony at issue in Morabit, we agree with the trial justice in the instant case, who ruled that Mr. O'Connor's testimony "was not so

- 21 -

technical that it required peer-reviewed publication support, but his opinion was helpful to the jury because of his skills, experience, training, and education in environmental engineering— skills beyond the understanding of laypersons of ordinary intelligence." Mr. O'Connor's testimony mainly involved explaining to the jury the numerous environmental reports concerning the Property. After meticulously referencing that material, Mr. O'Connor opined that TCA and PCE were present on Parcel A before 2003 and that the VHB company found concentrations of TCA and PCE on Parcel A in 2005. Mr. O'Connor then made what strikes us as being an entirely reasonable inference—viz., that the hazardous substances found by VHB in 2005 were present on the Property in 2003. Mr. O'Connor explained this inference by: (1) noting that a number of environmental reports dating back to 1986 indicated that TCA and PCE had been generated on the Property; (2) further noting that the 1993 Weston Report, the 1997 ICEE report, and the 1998 Paragon report all documented the presence of TCA and PCE in the soil and groundwater samples; (3) pointing out that the VHB company also found TCA and PCE in the same area that Weston, ICEE, and Paragon had previously tested (viz., Parcel A); and (4) observing that VHB found the contaminated soil underneath at least ten feet of clean soil.

This Court has previously emphasized that, when ruling on the admissibility of expert testimony, a trial justice should not interpret the rules of evidence in such a "narrow and stringent" manner so as to "impermissibly conflate[] her own functions with those of the jury." Gallucci, 709 A.2d at 1064. We have further stated: "If the evidence presented to support the expert's proposed opinions is sufficient to allow a reasonable juror to conclude that his [or her] * * * methods are grounded in valid science, then cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the appropriate means of attacking

the reliability of this evidence." Morabit, 80 A.3d at 13 (internal quotation marks omitted); see also Owens, 838 A.2d at 899-900.

In the instant case, Huhtamaki cross-examined Mr. O'Connor with respect to his knowledge of chemical degradation, and he conceded that testing by an "[e]nvironmental forensics expert" would be necessary in order to determine when a substance was first introduced into the environment. Notably, however, Mr. O'Connor never opined as to when the hazardous materials were first released into the soil of Parcel A. In fact, at the end of the voir dire, the trial justice had expressly prohibited him from opining as to the time of the discharge into the soil. Instead, Mr. O'Connor maintained that, based solely on his review of the Property's extensive environmental history, he could reasonably infer that TCA and PCE were present on Parcel A in 2003. After careful review of the trial testimony, we perceive no basis for holding that the trial justice abused his discretion in admitting Mr. O'Connor's testimony in this regard.

## C

### Spoliation

Huhtamaki claims that the trial justice erred in admitting evidence related to the excavated soil samples because Ferris excavated the soil before Huhtamaki could test it. It is well settled that the admission of evidence is confided to the sound discretion of the trial justice and "[t]he exclusion of such evidence is not reversible error unless the trial justice abused his [or her] discretion, thereby causing substantial injury to the party seeking the admission of such evidence." Gaglione v. Cardi, 120 R.I. 534, 538, 388 A.2d 361, 363 (1978).

Rhode Island courts usually deal with the issue of spoliation through an appropriate instruction to the jury indicating that the jurors are free to draw an adverse inference against the

despoiler.[21] See, e.g., Youngsaye v. Susset, 972 A.2d 146, 148, 150 (R.I. 2009); Kurczy v. St. Joseph Veterans Association, Inc., 820 A.2d 929, 946-47 (R.I. 2003); Tancrelle v. Friendly Ice Cream Corp., 756 A.2d 744, 748-49 (R.I. 2000). As we have stated, "the doctrine of spoliation merely permits an inference that the destroyed evidence would have been unfavorable to the despoiler." New Hampshire Insurance Co. v. Rouselle, 732 A.2d 111, 114 (R.I. 1999) (emphasis added). In fact, in Farrell v. Conetti Trailer Sales, Inc., 727 A.2d 183 (R.I. 1999), we held that the trial justice in that case abused his discretion when, as a penalty to address spoliation, he refused to admit certain evidence. Id. at 187. We held that the trial justice should have instead admitted the evidence and instructed the jury that it might draw an unfavorable adverse inference against the despoiler. Id. at 188. In the instant case, the trial justice did what this Court endorsed in the just-cited case—viz., admitting the evidence while giving a proper instruction as to the ability of the jury to draw an unfavorable adverse inference.

Nevertheless, undaunted by the existing state of our spoliation jurisprudence, Huhtamaki contends that there is what it characterizes as a "trend in the law" to impose sanctions more severe than an adverse inference instruction. To support this assertion, Huhtamaki cites two trial court opinions—one from the United States District Court for the District of Connecticut, Innis Arden Golf Club v. Pitney Bowes, Inc., 257 F.R.D. 334 (D. Conn. 2009) and the other from the Rhode Island Superior Court, Berrios v. Jevic Transportation, Inc., No. PC-04-2390, 2013 WL 300889 (R.I. Super. January 18, 2013). Even if we were persuaded (and we most emphatically

---

[21] We have previously described as follows the adverse inference that the jury is permitted to draw in the spoliation context: "[T]he deliberate or negligent destruction of relevant evidence by a party to litigation may give rise to an inference that the destroyed evidence was unfavorable to that party." Kurczy v. St. Joseph Veterans Association, Inc., 820 A.2d 929, 946 (R.I. 2003) (internal quotation marks omitted); see also Tancrelle v. Friendly Ice Cream Corp., 756 A.2d 744, 748 (R.I. 2000).

are not) that these two decisions are tantamount to a "trend in the law," the case at bar is readily distinguishable. Both the Connecticut federal court in Innis Arden Golf Club and the Superior Court in Berrios reasoned that they were justified in barring the despoiler from introducing certain evidence due to the despoiler's particularly egregious conduct in each instance. See Innis Arden Golf Club, 257 F.R.D. at 343 (finding that the despoiler's act was such that an adverse inference would "not adequately serve the prophylactic and preventative purposes of the spoliation doctrine in these circumstances"); Berrios, 2013 WL 300889 at *17.

By contrast, in the instant case, Huhtamaki had notice of the presence of hazardous substances on Parcel A from the moment that it received DEM's Letter of Responsibility. Additionally, according to Mr. Steeves's testimony, in a January 3, 2006 phone conversation, DEM told Huhtamaki that Ferris planned to excavate the contaminated soil. Thus, unlike the parties in Innis Arden Golf Club and Berrios, Huhtamaki was not meaningfully prejudiced by Ferris's excavation of the soils because it was aware of Ferris's planned excavation for nearly a month before it occurred and never objected or took other action. In view of the fact that Huhtamaki was not meaningfully prejudiced by the removal, we discern no abuse of discretion in the trial justice's decision to admit the evidence regarding the contaminated soils.

**D**

**Jury Instructions**

Huhtamaki also contends that there was error in the trial justice's jury instructions concerning: (1) the "Claim Notice" issue; and (2) the spoliation of evidence. It is well settled that this Court reviews jury instructions in a de novo manner. King v. Huntress, Inc., 94 A.3d 467, 482 (R.I. 2014); see also Oden v. Schwartz, 71 A.3d 438, 450 (R.I. 2013). In conducting that review, we examine the charge to the jury "in its entirety, rather than examining single

sentences or selective parts of the charge in isolation, * * * [outside of] the context in which they were rendered." King, 94 A.3d at 482 (internal quotation marks omitted); see also Botelho v. Caster's Inc., 970 A.2d 541, 545 (R.I. 2009). Moreover, we review jury instructions "in light of the meaning and interpretation that a jury composed of ordinary, intelligent lay persons would give them." Hueston v. Narragansett Tennis Club, Inc., 502 A.2d 827, 829 (R.I. 1986). In addition, this Court has made it clear that "[a]n erroneous charge warrants reversal only if it can be shown that the jury could have been misled to the resultant prejudice of the complaining party." Contois v. Town of West Warwick, 865 A.2d 1019, 1022 (R.I. 2004) (internal quotation marks omitted).

### 1. The Absence of an Instruction as to "Claim Notice"

Huhtamaki first argues that the trial justice erred in failing to instruct the jury "to make a specific finding as to whether [Ferris] had provided 'Claim Notice' to Huhtamaki." However, as discussed previously, the trial justice determined, at the summary judgment stage, that the February 14, 2006 letter constituted sufficient "Claim Notice" under the Indemnity Agreement. See Part I.A, supra. Accordingly, the sufficiency of "Claim Notice" was not an issue for the jury to grapple with at trial. Moreover, it is our view that Huhtamaki was not materially prejudiced (and therefore not relieved of its obligations under the Indemnity Agreement even if we assume that Section 6(a) applies to the instant case) by any purported delay in the providing of notice by Ferris because Huhtamaki received actual notice of the pollution. See Part III.A.2, supra. It necessarily follows that we discern no error in the trial justice's refusal to give such an instruction.

- 26 -

## 2.    The Spoliation Instruction

Next, Huhtamaki challenges the trial justice's jury instruction concerning spoliation.[22]  At

trial, Huhtamaki objected to the trial justice's instruction, arguing that the spoliation instruction

---

[22]    The trial justice's instruction relative to the spoliation of evidence reads as follows:

> "You have heard evidence in this case that [Ferris] excavated soil from Parcel A, and that Huhtamaki did not have an opportunity to perform certain testing on that soil as it lay in the ground.  When evidence is destroyed, we call it spoliation.  Under certain circumstances, spoliation of evidence may give rise to an adverse inference that the destroyed evidence would have been unfavorable to the position of the party who destroyed it.
> "Spoliation of evidence may be innocent or intentional, or somewhere between the two.  It is the unexplained and deliberate destruction of relevant evidence that gives rise to an inference that the thing destroyed would have been unfavorable to the position of the spoliator.  If you find that [Ferris] destroyed soil by excavating it from Parcel A and did so deliberately, then you are permitted, but not required, to infer that the evidence would have been unfavorable to [Ferris's] position in this case.
> "In deciding whether the destruction of soil was deliberate, you may consider all of the facts and circumstances which were proved at trial and which are pertinent to that item of evidence. You may consider who destroyed it, how it was destroyed, the legitimacy or lack of legitimacy in the reasons given for its destruction, the timing of the destruction, whether the individual destroying the evidence knew the evidence might be supportive of the opposing party, whether the spoliation was intended to deprive the Court of evidence, and any other facts and circumstances which you find to be true.  You may also consider the extent to which it has been shown that the spoliated evidence would indeed have been unfavorable to [Ferris's] position.  If the spoliation of the evidence is attributable to carelessness or negligence on the part of the spoliator, you may consider whether the carelessness or negligence was so gross as to amount to a deliberate act of spoliation.
> "If you find that Huhtamaki knew or should have known that [Ferris] planned to excavate the soils from Parcel A before [Ferris] did so, and that Huhtamaki had an opportunity to request that [Ferris] refrain from excavating the soil and allow Huhtamaki an opportunity to test it in the ground, and if you find further that Huhtamaki did nothing to stop [Ferris] from excavating the soil,

improperly imposed a duty on Huhtamaki to prevent the destruction of evidence. On appeal, Huhtamaki not only argues that the instruction imposed upon it a duty to preserve evidence (an objection which it sufficiently articulated at trial), but it also raises a new challenge to the jury instruction. For the first time on appeal, Huhtamaki argues that the trial justice erred in failing to sufficiently specify that the negligent destruction of relevant evidence would be sufficient to allow an adverse inference; it further argues that the trial justice compounded this alleged error when he stated in his jury instructions: "If the spoliation of the evidence is attributable to carelessness or negligence on the part of the spoliator, you may consider whether the carelessness or negligence was so gross as to amount to a deliberate act of spoliation."

Pursuant to this Court's raise or waive rule, "a litigant cannot raise an objection or advance a new theory on appeal if it was not raised before the trial court." Town of Barrington v. Williams, 972 A.2d 603, 609 (R.I. 2009) (internal quotation marks omitted); see also Berman v. Sitrin, 101 A.3d 1251, 1266 (R.I. 2014); Pollard v. Acer Group, 870 A.2d 429, 432 (R.I. 2005). We have consistently been exacting about applying the raise or waive rule in the face of inadequate objections to jury instructions. See King, 94 A.3d at 483; see also Tyre v. Swain, 946 A.2d 1189, 1200 (R.I. 2008). Notably, Rule 51(b) of the Superior Court Rules of Civil Procedure "bars a party from challenging an erroneous instruction unless [the party] lodges an objection to the charge which is specific enough to alert the trial justice as to the nature of [the trial justice's] alleged error." Botelho, 970 A.2d at 548 (internal quotation marks omitted). As we have stated, "[t]he rationale behind this rule is to allow the trial justice an opportunity to make any necessary corrections to his or her instructions before the jury begins its deliberations."

---

then I instruct you that you may not infer that because the soil was destroyed that the evidence would have been unfavorable to [Ferris's] position in this case."

DiFranco v. Klein, 657 A.2d 145, 147 (R.I. 1995); see also Mead v. Papa Razzi, 899 A.2d 437, 444 (R.I. 2006) ("Absent a sufficiently specific objection, the trial justice cannot be expected to divine the nature of counsel's objection."). Because Huhtamaki failed to raise at trial its newly minted objection to the trial justice's charge on spoliation that it now advances on appeal, Huhtamaki's arguments as to same are deemed to have been waived. See State v. Figuereo, 31 A.3d 1283, 1288-89 (R.I. 2011) (stating that the defendant's claims of error on appeal as to the jury instruction were subject to waiver because the objections which the defendant advanced on appeal were different from those advanced at trial).

Turning next to the objection to the jury instruction which Huhtamaki did properly preserve (viz., that the instruction imposed a duty on Huhtamaki to preserve evidence), it is our view that said objection is without merit. Specifically, Huhtamaki takes issue with the following instruction:

> "If you find that Huhtamaki knew or should have known that [Ferris] planned to excavate the soils from Parcel A before [Ferris] did so, and that Huhtamaki had an opportunity to request that [Ferris] refrain from excavating the soil and allow Huhtamaki an opportunity to test it in the ground, and if you find further that Huhtamaki did nothing to stop [Ferris] from excavating the soil, then I instruct you that you may not infer that because the soil was destroyed that the evidence would have been unfavorable to [Ferris's] position in this case."

Huhtamaki asserts that said language impermissibly imposed upon it a "pre-litigation duty" to preserve evidence that was not in its possession or control.

When viewed in the entirety, however, the trial justice's instruction substantially mirrors the instruction which this Court expressly deemed "appropriate" in Tancrelle, 756 A.2d at 749-50 n.3. It is important to realize that, in conducting appellate review, we examine the charge to the jury "in its entirety, rather than examining single sentences or selective parts of the charge in

isolation, * * * [outside of] the context in which they were rendered." King, 94 A.3d at 482 (internal quotation marks omitted); see also Botelho, 970 A.2d at 545. In our judgment, the one sentence that Huhtamaki challenges on appeal did not derogate from the correctness of the trial justice's overall charge to the jury. See Hueston, 502 A.2d at 829 ("Challenged instructions must be evaluated as a whole in light of the meaning and interpretation that a jury composed of ordinary, intelligent lay persons would give them."); see also Lieberman v. Bliss-Doris Realty Associates, L.P., 819 A.2d 666, 672 (R.I. 2003) ("[W]e shall not exaggerate out of context a single word or phrase or sentence in an instruction; rather, the challenged portion will be examined in the context of the entire instruction.") (internal quotation marks omitted); State v. Brown, 798 A.2d 942, 948 (R.I. 2002).

In fact, the trial justice's instruction makes clear that, in deciding the issue of spoliation, the jury should "consider all of the facts and circumstances which were proved at trial and which are pertinent to that item of evidence." Such pertinent "facts and circumstances" certainly include the fact that Huhtamaki had actual notice that contaminants had been found on the Property nearly a month before Ferris completed the excavation. Finally, other than arguing that there was an error, Huhtamaki has failed to show how, by virtue of this one sentence in the trial justice's charge, the jury "could have been misled to the resultant prejudice of the complaining party." Contois, 865 A.2d at 1022 (internal quotation marks omitted). Consequently, we discern no reversible error in the challenged instruction.

## E

## Pyramid of Inferences

Finally, Huhtamaki contends that Ferris's case was built on an improper "pyramid of inferences." This Court has previously stated that "[a] pyramiding of inferences takes place

when an inference is drawn from the underlying facts and a second inference is then drawn from that primary inference." Mead, 899 A.2d at 441 n.3 (internal quotation marks omitted). Such pyramiding of inferences "must be rejected as being without probative force where the facts from which it is drawn are susceptible of another reasonable inference." Waldman v. Shipyard Marina, Inc., 102 R.I. 366, 374, 230 A.2d 841, 845 (1967).

In support of its argument, Huhtamaki contends that Ferris's "primary inference" was that hazardous materials remained on Parcel A after Paragon completed its remediation in 1998. Huhtamaki argues that, because "evidence at trial, including Paragon's remedial work, [and] the No Further Action Letter * * * established that Parcel A was clean as of 1998. * * * [T]he only way for [Ferris] to prove its case was to have the jury draw a competing inference--namely, that Paragon did not fully clean Parcel A * * *."

It is our view, however, that Huhtamaki's argument is at best a mischaracterization. First, in spite of Huhtamaki's contentions to the contrary, there was no evidence at trial that Parcel A was clean as of 1998. In fact, the very evidence that Huhtamaki points to belies its contention. As previously mentioned, Huhtamaki argues that Paragon's remedial work, and the No Further Action Letter from DEM both established that Parcel A was clean as of 1998. However, Paragon's Closure Report, which was issued at the end of Paragon's remediation activities, explicitly states: "Paragon did not intend for [its] study to be an exhaustive investigation of subsurface conditions on the Site." As to the No Further Action Letter, it explicitly states, in bold-face type, that it was "not a Letter of Compliance pursuant to the Remediation Regulations." It is eminently clear to us that the No Further Action Letter is simply evidence that DEM did not mandate any further action—not that the site was deemed to be clean of hazardous materials.

By contrast, the inference for which Ferris advocated before the jury was that the hazardous substances (including TCA and PCE), which the VHB company discovered in 2005, were also present on Parcel A in 2003; the reasonableness of that inference is amply supported by the record. Mr. O'Connor testified extensively about the Property's environmental history, including the fact that the historical reports indicated that TCA and PCE were generated on the site and that TCA and PCE were both found in the soil and groundwater of Parcel A prior to 2003. The fact that VHB found those two substances (TCA and PCE), in the course of its own testing in 2005 in the same area underneath approximately ten feet of clean soil, supports a reasonable inference that those hazardous substances were present on Parcel A in 2003. As we have previously stated, "a reasonable inference from established facts is evidence and * * * such an inference should be considered and given effect by the trier of facts." Oury v. Greany, 107 R.I. 427, 431, 267 A.2d 700, 702 (1970). And it is a basic principle that "[i]nferences and presumptions are a staple of our adversary system of factfinding." State v. Ventre, 910 A.2d 190, 198 n.5 (R.I. 2006) (quoting County Court of Ulster County, New York v. Allen, 442 U.S. 140, 156 (1979)).

In view of the fact that the inference for which Ferris advocated is reasonable and supported by the evidence, we consider Huhtamaki's "pyramid of inferences" argument to be meritless.

## IV

### Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record may be returned to that tribunal.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

---

**TITLE OF CASE:**        Ferris Avenue Realty, LLC v. Huhtamaki, Inc., et al.

**CASE NO:**        No. 2013-344-Appeal.
(PB 07-1995)

**COURT:**        Supreme Court

**DATE OPINION FILED:**  February 25, 2015

**JUSTICES:**        Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**        Associate Justice William P. Robinson III

**SOURCE OF APPEAL:**        Providence County Superior Court

**JUDGE FROM LOWER COURT**:

        Associate Justice Michael A. Silverstein

**ATTORNEYS ON APPEAL:**

        For Plaintiff:  Michael T. Eskey, Esq.

        For Defendant:  Stephen J. Darmody, Pro Hac Vice